CHARLES C. CABOT & others vs. MICHAEL B. CORCORAN.

Suffolk.   October 7, 1954. — December 16, 1954.

Present: QUA, C.J., LUMMUS, WILKINS, WILLIAMS, & COUNIHAN, JJ.

Constitutional Law, Self incrimination.   Witness, Immunity from prosecution.   Special Commission.

The existence and powers of the special commission on organized crime
    established by Res. 1953, c. 100, terminated on March 3, 1954, the
    first Wednesday in March, when the time fixed by the resolve for the
    filing of the commission's report with the General Court expired, and
    the commission was not in existence nor in possession of its powers on
    March 31, 1954, notwithstanding an order adopted by the General
    Court on February 24, 1954, but never submitted to or approved by
    the Governor, extending the time for filing the commission's report to
    May 26, 1954, and a subsequent revival of the commission with its
    original powers by Res. 1954, c. 80, approved by the Governor on
    May 26, 1954.   [46–48]
The protection afforded by the privilege against self incrimination under
    art. 12 of the Declaration of Rights of the Massachusetts Constitution
    does not extend to Federal crimes.   [49–51]
A provision of Res. 1953, c. 100, affording immunity from prosecution to
    a person required by the resolve to testify and produce evidence before
    a special commission on organized crime even though such testimony
    and evidence might tend to incriminate him, was not insufficient in
    that the immunity granted did not and could not protect him from
    prosecution for Federal crimes.   [48–49]
A provision of Res. 1953, c. 100, whereby one who was required by the
    resolve to testify and produce evidence before a special commission
    on organized crime even though he might be incriminated thereby was
    granted immunity from prosecution "for or on account of any action,
    matter or thing concerning which he . . . [might] be required to
    testify or produce evidence . . . except for perjury committed in such
    testimony," furnished an immunity as broad as the privilege against
    self incrimination afforded by art. 12 of the Declaration of Rights of
    the Massachusetts Constitution and was valid.   [51–52]

PETITION, filed in the Superior Court on April 8, 1954.

The case was reported by Beaudreau, J.

Thomas J. McArdle, for the petitioners.

James W. Kelleher, (Robert K. Lamere with him,) for the
respondent.

QUA, C.J. This petition was filed in the Superior Court by the members of a special commission established under c. 100 of the Resolves of 1953 and "revived" by c. 80 of the Resolves of 1954 for the purpose of investigating the existence and extent of organized crime and organized gambling and related matters.

The prayers are that the respondent be ordered to answer forty questions which he refused to answer on the ground of self incrimination when he was summoned before the commission, all in reference to lottery tickets, lotteries, and related matters, and that he be ordered to answer such other questions as may be put to him relating to lottery operations, including questions as to the identity of others connected with him in such operations and questions concerning violation of the gambling laws by him and by others associated directly or indirectly with him and such other questions as may be put to him concerning the existence and extent of organized crime and gambling in the Commonwealth.

The facts are agreed. The judge reported the case without decision.

The resolve creating the commission was duly enacted, and was approved by the Governor on July 4, 1953. The commission was to consist of two members of the Senate, three members of the House of Representatives, and two persons to be appointed by the Governor. Its purpose was stated to be to investigate as a basis for legislative action the existence and extent of organized crime and organized gambling within the Commonwealth and other specified matters relative thereto. The resolve provided that the commission might require the attendance and sworn testimony of witnesses and the production of documents, and that any justice of this court or of the Superior Court might upon application of the commission compel the attendance of witnesses and the giving of testimony before the commission "in the same manner and to the same extent as before said courts." It further provided, "No person shall be excused from attending and testifying in the course of

such investigation, or from producing any books, papers or documents, on the ground that his testimony or evidence, documentary or otherwise, may tend to criminate him or subject him to a penalty or forfeiture; but he shall not be prosecuted or subjected to penalty or forfeiture for or on account of any action, matter or thing concerning which he may be required to testify or produce evidence, documentary or otherwise, in the course of such investigation, except for perjury committed in such testimony." The commission was authorized to employ legal, expert, clerical and other assistants, and the sum of $10,000 was appropriated for the purposes of the investigation. The resolve contained the following paragraph: "Said commission is hereby further directed to report to the general court the results of its investigations and its recommendations, if any, together with drafts of legislation necessary to carry such recommendations into effect, by filing the same with the clerk of the senate from time to time but not later than the first Wednesday in March, nineteen hundred and fifty-four."

1. The first question is whether the commission was in existence and in possession of its powers on March 31, 1954, when the respondent appeared before it and refused to answer the questions, claiming his privilege under art. 12 of the Declaration of Rights not to "be compelled to accuse, or furnish evidence against himself." We feel constrained to answer this question in the negative. The first Wednesday in March, 1954, the date by which the commission was directed by the resolve to report, fell on March 3, 1954. It is true that on February 24, 1954, the General Court in concurrence adopted an order extending to May 26 the time within which the General Court would receive the final report of the commission, but this order was never submitted to or approved by the Governor. The original resolve, c. 100, was in effect a statute, and an important one. It was enacted by both houses and approved by the Governor. It not only set up the commission but it bestowed upon the commission broad power to affect the

constitutional liberty of the citizen by requiring him to incriminate himself in return for immunity from prosecution. It may be that the General Court could by concurrent order such as that of February 24 decide to "receive" such reports as it saw fit, but nothing short of another statute passed by both houses and approved by the Governor would suffice to continue in effect the power of the commission to compel under statutory immunity the giving of testimony which without the immunity could not be compelled under the Constitution. *Matter of Doyle*, 257 N. Y. 244, 257–268. It is also true that by c. 80 of the Resolves of 1954, approved by the Governor on May 26, 1954, after the report to this court in the present proceeding had been filed in the Superior Court, the commission was "revived" with its original powers and directed to report not later than the last Wednesday of January, 1955. But it seems self evident that a subsequent revival of the commission cannot render the respondent amenable to court action to compel him to testify on account of, or punishable for, refusing to testify at a time when the commission had no power to summon him or to grant him immunity if he did testify.

But it is argued that the time for filing the commission's report limited in the original resolve, c. 100 of 1953, was directory only and did not terminate the existence of the commission. Undoubtedly many specifications in various statutes of the times for the performance by public officers of certain acts are directory and not mandatory, so that such acts can legally be performed after the expiration of the times specified. But we do not believe that legislative understanding and practice in this Commonwealth will permit the limitation in c. 100 of the Resolves of 1953 to be so treated, notwithstanding the use of the word "directed." It is clear that the commission was not intended to become a permanent part of the governmental structure of the Commonwealth. It is not assigned to any of the twenty executive and administrative departments. Its members have no specified terms of office. No provision is made for

succession if any memberships become vacant. When then does it end? Can it continue to exercise its extensive rights and powers to employ assistants, spend money, and summon witnesses indefinitely, or for some supposedly reasonable time, or until it decides of its own volition to file a report which it shall designate as final, or until some new statute is passed expressly terminating its existence? What if some or all of the members of the commission appointed from the Senate or the House of Representatives should cease to be members of those bodies? An examination of the bound volumes of the Acts and Resolves for the years 1952 and 1953 discloses that in those two years alone no fewer than twenty-eight special commissions were created to investigate and report to the Legislature and no fewer than fourteen resolves were enacted reviving such commissions previously created, all containing provisions fixing the time for filing reports similar to the provision in c. 100 of the Resolves of 1953. We cannot believe that the Legislature intended that each of these special commissions could ignore the time fixed for report and thereby continue itself in existence for an undetermined period. The very purpose of each of those commissions is to investigate and report. When it has reported it has nothing more to do. Why then should not the time fixed for report be taken as the time when it is intended the commission shall cease to exist? The number of resolves reviving such commissions seems to show that the Legislature itself takes the view that the commission is dead when the time fixed for its report has expired.

2. But this does not end the case. The commission has now been revived by c. 80 of the Resolves of 1954, and will probably again attempt to secure evidence from the respondent. The respondent in his answer alleges the existence of a controversy between him and the commission and prays for a declaratory decree. The petitioners also request such a decree. We therefore proceed to consider further questions.

The respondent insists that the immunity provisions of

the resolves are insufficient because they do not and cannot give him immunity against prosecution for Federal crimes. We are of opinion, however, that art. 12 of our Declaration of Rights does not protect against self incrimination with respect to Federal crimes. In *Republic of Greece* v. *Koukouras*, 264 Mass. 318, at pages 323–324, this court said, "We are of opinion the privilege against self-incrimination extends only to crimes which may be prosecuted within the latter [domestic] jurisdiction, and the rule of protection is confined to what may tend to subject the witness to penalties within this jurisdiction *and under the State sovereignty*" (emphasis supplied). The expression italicized was hardly necessary to the decision, since the law, violation of which the evidence sought might tend to show, was the law of Greece — a foreign country; but the expression was not a careless or inadvertent one. It was and is well supported by authority where the question arises between the State and Federal jurisdictions. In *State* v. *Wood*, 99 Vt. 490, at page 494, the Supreme Court of Vermont used an expression of the same meaning when it said with citation of authorities, "the only danger to be considered is such as arose within this jurisdiction *and under the state sovereignty*" (emphasis supplied). In *Dunham* v. *Ottinger*, 243 N. Y. 423, at page 438, the Court of Appeals of New York in answer to a contention that an immunity statute of that State was insufficient because it did not preclude the use of the testimony in criminal proceedings by the Federal government said, "It [the statute] does give ample protection against the use of such testimony in our own tribunals and it is perfectly well established that this is a sufficient immunity; that all that the State is required to or can do is to give immunity against its own processes and, if it has done that, as this statute does it, it has satisfied the requirements of the Constitution." This rule has been recognized or followed in very recent State decisions. *Koenck* v. *Cooney*, 244 Iowa, 153, 158. *Ferris* v. *Lockett*, 175 Kans. 704. *In re Pillo*, 11 N. J. 8, 16. *People* v. *Breslin*, 306 N. Y.

294; *S. C.* 306 N. Y. 875. Turning next to decisions of the Supreme Court of the United States, we find the rule epitomized in *United States* v. *Murdock*, 284 U. S. 141, at page 149, where the court says, "The principle established is that full and complete immunity against prosecution by the government compelling the witness to answer is equivalent to the protection furnished by the rule against compulsory self-incrimination." This statement is quoted with approval in the opinion of the court by Mr. Justice Frankfurter in *Feldman* v. *United States*, 322 U. S. 487, 491–492. To the same effect is *Hale* v. *Henkel*, 201 U. S. 43, 68–69. These cases have not been doubted or overruled. And see *Jack* v. *Kansas*, 199 U. S. 372; *Adamson* v. *California*, 332 U. S. 46, 54–55; Wigmore on Evidence (3d ed.) § 2258. In the cases of *People* v. *Den Uyl*, 318 Mich. 645, and *State* v. *Kelly*, Fla., 71 So. (2d) 887, 895–897, a contrary result was reached. But see *Lorenzo* v. *Blackburn*, Fla., 74 So. (2d) 289. And because of the supremacy clause it is held that a Federal statute may give immunity against State as well as Federal prosecution. *Adams* v. *Maryland*, 347 U. S. 179.

A conclusion that the Constitution of this Commonwealth confers upon a witness a privilege against self incrimination with respect to Federal crimes would lead to serious practical difficulties. No immunity statute can be enacted by a State that will protect against a Federal prosecution. *Jack* v. *Kansas*, 199 U. S. 372, 380. *Feldman* v. *United States*, 322 U. S. 487, 491. There are today many Federal crimes which deal with ordinary violations of State criminal law whenever in connection with such violation there has been interstate transportation or communication or use of the mails. Many crimes and particularly "organized" crime such as the present commission was established to investigate are likely to have ramifications which would bring them within the purview of some Federal statute. If the State Constitution grants a privilege against incrimination with respect to Federal crimes, it would seem that there can be no effective investigation of even the State aspects

of such crimes, since evidence of the commission of a crime within the State would constitute one element of proof of the commission of the Federal crime. And since the State cannot grant immunity as to the Federal crime it will remain helpless. The difficulty is not a merely fanciful one. It might well result that the investigation by the present commission would be seriously hampered and in large measure thwarted.

In 1780, when art. 12 was adopted as part of our Constitution, there was no Federal government and there were no Federal crimes. The privilege not to incriminate oneself had reference in the thought of that day only to such offences as the policy of the State might create. There could then have been no expectation that the policy of another sovereignty might establish other and different crimes, and that the State must yield to that policy, even to the extent of closing off from effective State investigation large areas of inquiry upon which the State might otherwise enter in pursuance of its own views of local policy and local necessity.

3. But the respondent further contends that the immunity provisions of the resolves under which the commission is acting are insufficient even under State law in that they do not furnish an immunity in all respects as broad as the constitutional privilege. We cannot agree with this. The provision is that no person shall be "prosecuted or subjected to penalty or forfeiture for or on account of any action, matter or thing concerning which he may be required to testify or produce evidence . . . ." It would be difficult to imagine an immunity more complete. The witness is not to be prosecuted for or on account of anything concerning which he has either testified or furnished evidence. This provision is substantially different from the one held inadequate in *Emery's Case*, 107 Mass. 172 (and in *Counselman* v. *Hitchcock*, 142 U. S. 547, which largely followed *Emery's Case*), on the ground that the immunity there granted extended only to "any statement made or paper produced by him" (107 Mass. at page 176) and did not extend to all "matters or causes in respect of which

he shall be examined, or to which his testimony shall relate" (107 Mass. at page 185); that is to say it was not as broad as the constitutional privilege not "to accuse, or *furnish evidence* against himself" (emphasis added). The immunity provision now before us seems to have been framed to meet the difficulty pointed out in *Emery's Case.* It was designed to grant an immunity as broad in all respects as the privilege, and it should be so construed. Similar immunity statutes have been held valid in jurisdictions where the interpretation of the constitutional privilege does not materially differ from that given to our own Constitution in *Emery's Case.* *Brown* v. *Walker,* 161 U. S. 591. *In re Critchlow,* 11 Cal. (2d) 751. *State* v. *Ruff,* 176 Minn. 308. *State* v. *Nowell,* 58 N. H. 314. Wigmore on Evidence (3d ed.) §§ 2281, 2283. 118 A. L. R. 619.

A final decree is to be entered denying relief based upon the respondent's refusal to answer the questions set forth in the petition at a time when the commission was out of existence but declaring that if he is again summoned before the commission while it is in existence in consequence of c. 80 of the Resolves of 1954, or under any statutory extension, it will be his duty to answer those and any other questions relating to the subjects which the commission is authorized to investigate, and that if he claims privilege not to incriminate himself he cannot thereafter be prosecuted or subjected to penalty or forfeiture in any tribunal of this Commonwealth for or on account of any matter or thing concerning which he may be required to testify or produce evidence or for or on account of any disclosure of the circumstances of any offence, the sources from which, or the means by which evidence of its commission or of his connection with it may be obtained or made effectual for his conviction. *Emery's Case,* 107 Mass. 172, 182.

*So ordered.*