JOHN WILLIAM WARD & others[1] vs. ENDICOTT PEABODY.

Suffolk. February 8, 1980. — June 4, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & LIACOS, JJ.

*Special Commission. Investigating Body. Constitutional Law*, Federal
supremacy, Subpoena. *Witness*, Subpoena. *Privacy. Attorney at
Law*, Work product.

The investigatory power of the Legislature's Commission Concerning
State and County Buildings did not expire when the commission
caused proposed remedial legislation to be introduced on its behalf
where the resolve creating the commission stated that the commission
should cease its investigation "upon filing its final report." [814-815]
Federal convictions of two State Senators on charges arising out of their
extortion of moneys from an architectural firm which had a large con-
struction contract with the State did not preclude a State commission
from investigating the same congeries of happenings. [815-816]
The Legislature's Commission Concerning State and County Buildings
was not precluded from obtaining certain materials from a law firm's
files in connection with its investigation into a large construction con-
tract which had been awarded to one of the firm's clients on the sole
ground that the materials constituted work product of lawyers where
it did not appear that any of the material was related to pending or
prospective litigation, where the activities of counsel were themselves
a subject of investigation by the commission, and where the client did
not itself claim any privilege in connection with the materials.
[817-818]
Upon remand of an action by the Legislature's Commission Concern-
ing State and County Buildings to enforce a summons requiring the
respondent to produce certain documents, the respondent would be
entitled to press privacy considerations with respect to items or
categories of documents having attenuated or remote relevance to the
commission's investigation. [819-820]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on November 16, 1979.

[1] Francis X. Bellotti, Frances Burke, Peter Forbes, Daniel O. Mahoney,
Walter J. McCarthy, and Lewis H. Weinstein.

On transfer to the Superior Court Department the case was heard by *Brogna*, J. The case was thereafter retransferred to the Supreme Judicial Court for the county of Suffolk.

*Thomas E. Dwyer, Jr. (Michael L. Tabak* with him) for the petitioners.

*Morris M. Goldings (H. Glenn Alberich* with him) for the respondent.

KAPLAN, J. The Legislature's Special Commission Concerning State and County Buildings (Commission), of which the named plaintiffs are the members, issued a summons to the respondent Endicott Peabody, a member of the Bar, formerly Governor of the Commonwealth, requesting him to appear and testify before the Commission and to produce certain documents in his possession or control. The respondent did not object to appearing in response to the summons, but he declined to produce the documents specified, although he did not invoke the privilege against self-incrimination and any claim of the attorney-client privilege was abandoned. The Commission accordingly commenced proceedings to enforce the documentary part of the summons, and the matter was heard by a judge of the Superior Court. The judge refused all enforcement but, assuming provisionally that he might be held wrong in that decision, went on to suggest which items of the summons should be enforced and which refused enforcement. On expedited appeal to this court, we entered a brief Order holding that the summons should be enforced according to its terms, except for certain items, as to which the Commission would be entitled at its request to another hearing in the Superior Court where its claims to production could be further considered and ruled on. We stated that a rescript and an opinion or opinions would follow.

1. *Commission's Functions and Program.* By early 1978, there had been intimations in the press and elsewhere about corruption in the award and supervision of construction contracts by agencies of government; criminal proceedings had been instituted against certain individuals alleged to be implicated; and revelatory hearings had been conducted by

a subcommittee of the Joint Legislative Committee on Post
Audit and Oversight. All this led to the adoption of Resolves
1978, c. 5, superseded in effect by Resolves 1979, c. 11, cre-
ating the "special commission" which in effect is the present
plaintiff. The Commission was directed "to investigate and
study as a basis for legislative action [i] the existence and ex-
tent of corrupt practices and maladministration concerning
contracts awarded no earlier than [January 1, 1968] related
to the construction of state and county buildings . . .; [ii] the
existence of conditions which tend or may tend to permit the
occurrence of said practices and maladministration; and [iii]
the existence of limitations on the powers and functions of
those charged with the duty of approving, supervising or
overseeing said contracts or with the enforcement of laws
related thereto." The stated powers of the Commission in-
cluded a power to issue process for appearance to give testi-
mony and for production of documents, and where necessary
to seek judicial enforcement of such process; also a power to
grant immunity from prosecution for testimony before the
Commission, contingent on judicial approval.

The Commission had discretion what to investigate and
study within the range of the resolve, but there was one stat-
ed requirement or duty, namely, that it "shall include" in its
investigation and study "consideration of the awarding, im-
plementation and the subsequent events concerning the
contract between the firm of McKee-Berger-Mansueto, Inc.
[MBM] and the commonwealth relating to the management
of construction of certain buildings on the Boston campus of
the University of Massachusetts." The reference was to a
contract of 1969 under which MBM, an architectural firm
with its principal office in New York, received fees of about
$5,000,000 for managing — in place of the State Bureau of
Building Construction which ordinarily carried out that
function — the construction of the university extension cost-
ing some $150,000,000, said to be the largest construction
project undertaken by the Commonwealth to that time.

Under way about July, 1978, the program of the Com-
mission, as described by its counsel, was first to consider,

through investigation and hearings, the systemic features of existing procedures for the award and supervision of State and county construction contracts, a task falling to phase [iii] of the resolve. This included comparative examination of the procedures used in other States. As will be seen below, the tentative product of this part of the program was a package of legislative proposals introduced on the Commission's behalf on December 5, 1979. A second part of the program, to some extent overlapping and being prepared simultaneously with the first, was consideration of corrupt practices and the conditions permitting or fostering them — related to phases [i] and [ii].

2. *Commission's Proposed MBM Investigation.* Regarding MBM's operations in Massachusetts, including its construction-management contract with the Commonwealth, the Commission wanted to study whether or how, through contacts with or payments or contributions to persons holding official positions or others who might influence such persons, MBM might have been able to prejudice agency actions in the award of contracts or in the supervision of their performance, as well as to prevent official investigation of performance or to procure favorable official report thereof. That information on these topics might feasibly be secured through Commission investigation was suggested by a number of public records (besides many private sources available to the Commission). Notable among these was the trial in 1977 of State Senators Joseph J. C. DiCarlo and Ronald C. MacKenzie in the Federal District Court, at which the respondent testified; also the above-mentioned hearings in 1978 by the subcommittee of the Joint Legislative Committee on Post Audit and Oversight, at which the respondent testified and produced certain documents. As the DiCarlo-MacKenzie trial assumed importance in the judge's decision below, we add some detail about it, following the account of the evidence in *United States* v. *DiCarlo,* 565 F.2d 802, 803-805 (1st Cir. 1977) (affirming convictions), cert. denied, 435 U.S. 924 (1978).[2]

---

[2] See also *United States* v. *DiCarlo,* 575 F.2d 952 (1st Cir. 1978) (affirmance of denial of new trial).

In February, 1971, DiCarlo cosponsored a legislative or-
der for an investigation of the university construction proj-
ect. After the order was filed for adoption, the respondent
and Gerald McKee, Jr., MBM's president, delivered a letter
to DiCarlo responding to certain allegations that had been
made about the project. DiCarlo, through his intermediary
MacKenzie, ultimately demanded of McKee (through one
Harding) payment of $40,000 in consideration of a report
favorable to MBM. After adoption of the order, appoint-
ment of a committee (with DiCarlo as co-chairman) to car-
ry it out, and hearings before the committee, MBM through
McKee paid a total of $40,000 to MacKenzie destined for
DiCarlo, and McKee was then able in effect to dictate the
conclusions of the report issued by the committee. The de-
fendants in the Federal prosecution were convicted of con-
spiracy to violate, and substantive violations of, the Hobbs
Act (extortion affecting interstate commerce) and the Trav-
el Act (use of facilities of interstate commerce for unlawful
activities).

3. *Summons.* MBM had retained the respondent or his
firm in order to assist the company to secure the award of
the management contract. The respondent continued to
represent the company during the period in which the con-
tract and performance thereunder came into question. Ac-
cordingly, it was very natural for the Commission, pursuing
its stated duty under its resolve, to seek the respondent's tes-
timony and production of pertinent documents in his con-
trol. The documentary material could be thought particu-
larly useful in reconstructing the central occurrences which
antedated the Commission's investigation by eight to ten
years.

Commencing in February, 1979, there was negotiation
between counsel for the respondent and the Commission
looking to the voluntary production of the papers. On
June 13, 1979, Commission counsel sent the respondent a
letter with eleven groupings or categories of the documents
desired, which were to be furnished, if they existed, from a
total of not more than, roughly, fourteen expandable file

folders comprising all the respondent's papers relating to MBM (minus the documents previously produced at the request of the Post Audit subcommittee). The respondent honored the Commission's request to the extent of turning over a folder (and file box) containing primarily "tub cards" reflecting time charged to the MBM account with short or cryptic notations as to the nature of the work underlying those charges. This production fell far short of the request and so, after some further negotiation, the Commission, following rule 4(a) of its rules of procedure, issued a summons dated October 12, 1979, requiring the respondent's appearance to testify and to produce the documents substantially as described and classified in the June 13 letter (minus those submitted after request).

Upon the respondent's application to the Commission to quash the documentary part of the summons, the Commission pursuant to its rule 4(h) held a closed hearing on November 9 at which there was argument by counsel on both sides. On November 14 the application was denied, with findings, rulings, and order holding that the summons was not unreasonable or overbroad, that the papers were not protected by privilege or a "work product" rule, and that there had not been substantial compliance with the summons. On November 16 the Commission, by its members, acting under the terms of the resolve, filed a petition in this court for Suffolk County for enforcement of the summons. The single justice transferred the petition to the Superior Court, which was also competent under the resolve, and a hearing was held there on December 4, 1979. This chanced to be the day of an announcement by the Commission that it was causing to be filed the following day proposed legislation that would, among other proposed reforms, revise the procedure for award of construction contracts and create an office of "Inspector General" with powers of investigation and oversight.

The documents called for by the summons were those in the control of the respondent relating or referring to: (1)

billings of MBM[3] by the respondent's firm, including
summaries of services rendered; (2) billings of MBM by
other firms or persons; (3) investigation of new business
possibilities for MBM and advice in connection therewith;
(4) negotiations of contracts for MBM; (5) former investiga-
tions of MBM or its activities proposed or ongoing at the
time; (6) contacts by the respondent with elected or ap-
pointed government officials or government employees
regarding MBM; (7) payments or promises thereof made by
or on behalf of MBM to government officials or candidates
for office or members of their immediate families; (8) con-
tacts of MBM with members of the respondent's administra-
tion or campaign staff while he was Governor (1963-1965);
(9) any of seventy-four named persons in connection with
MBM; (10) respondent's election to the board of directors of
Scientific Resources Corporation and potential conflict of
interest with his representation of MBM; (11) direct or in-
direct financial interest of the respondent in MBM.

4. *Rulings on Summons.* At the hearing in Superior
Court on December 4, 1979, counsel discussed the docu-
ments as a whole or in their categories; in camera inspection
of the papers was not requested or undertaken by the judge.

In his findings, rulings, and order of January 24, 1980,
the judge held the summons completely unenforceable on
grounds that the Commission's powers (or at least its power
to investigate by summons) expired with its submission on
December 5 of draft legislation, or that enforcement would
contravene the supremacy clause of the United States Con-
stitution because of collision with the Federal prosecution
and convictions of DiCarlo and MacKenzie. But if those
grounds for denial should fail, then the judge was of opinion
that production of certain categories or items therein should
anyway not be compelled: categories (3) and (5) because

---

[3]By definitions in the summons, "MBM" was taken to include affiliated
companies and so forth, and the material sought extended to MBM's ac-
tivities in Massachusetts not confined to the 1969 contract. Our summary
of the eleven groupings omits various details.

calling for "work product"; (6) for the same reason and because it was "overbroad"; (8) because overbroad and outside the scope of the resolve. Further, production in category (4) should be ordered only as to preliminary drafts of contracts, and in (9) only as to letters to or from the listed individuals or dates of telephone conversations with them. Judgment entered for the respondent dismissing the petition.

The case reached us on the appeal of the members of the Commission from the judgment;[4] the respondent lodged no cross appeal. Our Order dated February 14 rejected the grounds for denying all enforcement, and held that in the circumstances of the case "work product" was not a ground for denying production of any category or item, but irrelevance of any demanded material to the purposes of the resolve would be a ground, and in that connection consideration of privacy interests should play a part. The Commission would be at liberty to apply to the Superior Court for hearings on relevancy as to the categories (6 and 8) and parts of the categories (4 and 9) denied by the judge in his alternative ruling; otherwise the summons was held subject to immediate enforcement.

5. *Discussion.* (a) *General precepts.* Under its resolve the Commission was to investigate and study the condition of the law and the nature of current practice, legitimate and otherwise, in a field subject to regulation by the Legislature, and to advise and assist that body by proposing such remedial legislation as informed thought might suggest. Thus the resolve and the inquiry it authorized were within lawful bounds entering as they did "into those areas in which [the Legislature] may potentially legislate or appropriate." *Barenblatt* v. *United States,* 360 U.S. 109, 111 (1959). See *Attorney Gen.* v. *Brissenden,* 271 Mass. 172, 176, 181 (1930); *Watkins* v. *United States,* 354 U.S. 178, 187 (1957); *People ex rel. McDonald* v. *Keeler,* 99 N.Y. 463,

---

[4] The appeal was expedited by proceedings before the single justice to settle the record which was amplified in some respects by agreement of the parties.

485 (1885). Information in the form of documents called for by Commission process, like information sought from a witness on oral examination, must be relevant to the subject of investigation as defined by the resolve. See *Sweezy* v. *New Hampshire,* 354 U.S. 234, 254-255 (1957); *McGrain* v. *Daugherty,* 273 U.S. 135, 176-178 (1927); Liacos, Rights of Witnesses Before Congressional Committees, 33 B.U.L. Rev. 337, 358 (1953). But in testing relevance it must be understood that too rigid or exacting an approach might unduly trammel the Commission's enterprise which, on its investigatory side, could not, at least at the beginning, know exactly its own limits.[5]

The record of some legislative investigating committees and commissions of relatively recent memory warns of the possibility of abuse of the information gathering function, and so, in the first place, nice care must be taken to allow legitimate claims of standard privileges against even demand for relevant information: important here are the privilege against self-incrimination and the attorney-client privilege. See, e.g., *Quinn* v. *United States,* 349 U.S. 155, 161 (1955). Inquiries in some sense germane to the work of a commission may trench so far on First Amendment rights — for example, associational rights — that the information demanded can be withheld without courting contempt. See *Gibson* v. *Florida Legislative Investigation Comm.,* 372 U.S. 539 (1963); *Barenblatt* v. *United States, supra.* At the edge of relevancy, when the value to the investigation of a piece of demanded information is seen to be marginal, courts have been prepared to assess and allow as a counterweight "the right to be exempt from all unauthorized, arbitrary or unreasonable inquiries and disclosures in respect of

---

[5] Hence our cases speak of a legislative committee's power to compel production of documents not "plainly irrelevant" to the authorized investigation. See *Finance Comm'n of Boston* v. *Basile,* 354 Mass. 188, 190 (1968); *Gardner* v. *Massachusetts Turnpike Auth.,* 348 Mass. 532, 534-535 (1965); *Finance Comm'n of Boston* v. *McGrath,* 343 Mass. 754, 765 (1962). Cf. *Matter of Civil Investigative Demand Addressed to Yankee Milk, Inc.,* 372 Mass. 353, 360-361 (1977) (civil investigative demand).

[a witness's] personal and private affairs" (*Sinclair* v. *United States*, 279 US. 263, 292 [1929]) — a privacy interest to which we return at point (d) below. Finally, there is protection against harassing tactics unjustified by the requirements of sober investigation.[6]

(b) *Supposed illegality of entire documentary part of summons.* (1) Expiration of investigatory power. As noted, the Commission caused proposed remedial legislation to be introduced in the House on December 5, 1979. According to the judge, this must have the effect of putting the Commission entirely out of business or at least aborting its power of investigation and thus invalidating the outstanding summons. The judge's point appears to have been that, as the Commission had discharged its function of advising the Legislature, any further investigation by it must be bootless, unless, indeed, its purpose was to harass the respondent and perhaps to try to show him guilty of a crime, with the possible collateral purpose of creating an atmosphere in the Legislature, or at large, conducive to the passage of the proposed legislation.[7]

If the resolve, fairly interpreted, meant to cut off Commission power to investigate upon the submission of draft legislation, then of course the judge was right, for investigation may not exceed the time allotted to the Commission by

---

[6] See, e.g., *Gardner* v. *Massachusetts Turnpike Auth.*, 347 Mass. 552, 561 (1964) (number of documents requested should not exceed reasonable limits); *Yankee Milk, Inc., supra* (documents to be described with reasonable particularity); *United States* v. *Cross*, 170 F. Supp. 303 (D.D.C. 1959) (cannot recall witness just to show perjury in previous testimony).

[7] The Commission has no power to act as a "law enforcement or trial agency" (*Watkins* v. *United States*, 354 U.S. 178, 187 [1957]), but it is directed by the resolve to pass any evidence of criminal wrongdoing it discovers to the appropriate law enforcement agencies "under conditions of confidentiality," a practice validated in *Commonwealth* v. *Favulli*, 352 Mass. 95 (1967). Cf. *Gardner* v. *Massachusetts Turnpike Auth.*, 347 Mass. 552, 558-559 (1964). The Commission may inform or educate the people and their representatives as to what it uncovers, provided it is acting otherwise within the scope of its resolve. See *Hutcheson* v. *United States*, 369 U.S. 599, 615 (1962) (plurality); Wyzanski, Standards for Congressional Investigations, 3 Record of B.A. of City of N.Y. 93, 102 (1948).

the resolve, any more than investigation may exceed the boundaries of relevance to the subject matter assigned by the resolve. See *Cabot* v. *Corcoran*, 332 Mass. 44, 46-48 (1954). But the text of the resolve does not bear such an interpretation. It states: "The commission shall cease its investigation and study upon filing its final report . . . ." This final report, by the terms of the resolve, was not due until June 30, 1980.[8] It is perhaps enough to say that a statement by the Commission accompanying the release of the December 5 proposals indicated that it had not yet completed drafting and submitting legislation (and, besides, in the ordinary course, a commission might be expected to assist the Legislature in working out amendments to the drafts submitted on December 5 as those took the usual internal course toward passage or defeat). But we are far from suggesting that investigatory power would lapse if the Commission had firmly decided on December 5 that it would make no further legislative proposals, for a final report, supported by investigation, might be useful to the Legislature in any event. See *School Comm. of Boston* v. *Finance Comm'n of Boston*, 364 Mass. 187, 192 (1973); *Hutcheson* v. *United States*, 369 U.S. 599, 616 (1962) (plurality); Landis, Constitutional Limitations on the Congressional Power of Investigation, 40 Harv. L. Rev. 153, 205 (1926).[9]

(2) Federal supremacy. The judge asserted as a further basis for refusing enforcement of the summons that it was

---

[8] "The commission shall file . . . the final report of its investigation and study and its recommendations, if any, together with drafts of legislation necessary to carry its recommendations into effect, by filing the same with said clerk [of the House] on or before June thirtieth, nineteen hundred and eighty.

"The commission shall cease its investigation and study upon filing its final report . . . ."

[9] *Cabot* v. *Corcoran*, 332 Mass. 44 (1954), cited by the respondent, is not in point. There we held that a special legislative commission on crime was not legally in existence at the time a witness was called before it because the time for a final report had expired and no valid law had been enacted to extend the filing date: "the commission is dead when the time fixed for its report has expired." *Id.* at 48.

forbidden by art. VI, cl. 2, of the Federal Constitution.[10] He thought the convictions of DiCarlo and MacKenzie on the Federal charges precluded the Commission as a State entity from investigating the same congeries of happenings;[11] especially so, in his view, where the Commission was proceeding on a theory that MBM or those associated with the company were wrongdoers, whereas the Federal prosecution limned them as having been the parties wronged.

The judge perhaps was intimating that the Federal convictions should have a kind of res judicata effect as against the inquiry directed by the State Legislature. But the remoteness of that suggestion from settled law may be shown by recalling the rule that after Federal conviction under Federal law a State is not constitutionally inhibited from prosecuting the same person on the same facts under the State law, the "sovereignties" being considered separate. See *Commonwealth* v. *Cepulonis*, 374 Mass. 487, 490-492 (1978); *Bartkus* v. *Illinois*, 359 U.S. 121 (1959); *Abbate* v. *United States*, 359 U.S. 187 (1959).

If, in a general sense, the supremacy clause tries to guard against Federal policy being thwarted or undermined by inconsistent State activities, it is hard to see how that objective could be defeated by the present summons or its aftermath. The case is quite different from one in which a State legislative committee once attempted to conduct an investigation of a Federal agency.[12] We may observe, incidentally, that the Commission is not shown to be committed to proceeding on a given theory against or about MBM; it desires to investigate the facts.

---

[10] "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land."

[11] In fact the summons extended beyond the particular management contract of 1969; see note 3 above.

[12] See *United States* v. *Owlett*, 15 F. Supp. 736 (M.D. Pa. 1936) (investigation by Pennsylvania commission of activities of Works Progress Administration in that State held to violate supremacy clause). Cf. *United States* v. *McLeod*, 385 F.2d 734 (5th Cir. 1967) (Alabama grand jury cannot investigate local activities of United States Department of Justice).

(c) "*Work product.*" The judge in his alternative ruling would excuse production of certain of the materials in the law firm's files, assumed to be relevant, on the sole ground that they constituted work product of lawyers. According to the judge's conception, "there should be little or no part of a lawyer's file which is not protected from invasion," and the Commission could not show "good cause" to the contrary, because production "cannot aid the draft of legislation" — evidently a return to the proposition shown to be ill-considered at point (b)(1) above. The judge's general statement fails to meet the specifics of the present case.

The work product doctrine, drawn from the well-known case of *Hickman* v. *Taylor*, 329 U.S. 495 (1947), is intended to enhance the vitality of an adversary system of litigation by insulating counsel's work from intrusions, inferences, or borrowings by other parties as he prepares for the contest. *Id.* at 511; Developments in the Law — Discovery, 74 Harv. L. Rev. 940, 1028-1029 (1961). Originally developed in connection with civil litigation, the doctrine has been extended to criminal cases. *United States* v. *Nobles*, 422 U.S. 225, 238 (1974); *In re Special September 1978 Grand Jury II*, No. 79-1218, slip op. at 13 (7th Cir. April 16, 1980).

The field of operation of the work product rule is, as indicated, preparation for litigation. See *In re Fischel*, 557 F.2d 209, 212-213 (9th Cir. 1977); *Colton* v. *United States*, 306 F.2d 633 (2d Cir. 1962), cert. denied, 371 U.S. 951 (1963); 8 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2024, at 198 (1970). This includes litigation which, although not already on foot, is to be reasonably anticipated in the near future. *Special Grand Jury*, slip op. at 21. There is no indication in the present case that any part of the material called for had the necessary relation to litigation, pending or prospective, and it is in fact known that at least some of it was connected rather to efforts to obtain business for MBM.

We may add on this score that even if it had been shown that any of the material was created with a definite view to litigation, or even if that requirement were to be casually

disregarded, the respondent would be met by the fact that the occasions for the writing of these papers are now long past, and as far as appears neither the papers nor their substantial equivalents are available from another source. These are factors often held to be favorable to requiring production. See, e.g., *McDougall* v. *Dunn*, 468 F.2d 468, 474 (4th Cir. 1972); *United States* v. *Murphy Cook & Co.*, 52 F.R.D. 363, 364 (E.D. Pa. 1971).

A further quite distinctive factor in the present case is that the words and deeds of the attorney are themselves a subject of relevant inquiry by the Commission. It has not been supposed that the *Hickman* policy has anything to do with such a situation. See *Truck Ins. Exch.* v. *St. Paul Fire & Marine Ins. Co.*, 66 F.R.D. 129, 136 (E.D. Pa. 1975); *Kirkland* v. *Morton Salt Co.*, 46 F.R.D. 28, 30 (N.D. Ga. 1968). Otherwise stated, in the singular instances "when the activities of counsel are inquired into because they are at issue in the action before the Court, there is cause for production of documents that deal with such activities, though they are 'work product.'" 4 Moore's Federal Practice par. 26.62[4], at 26-447 (2d ed. 1979). See *Kearney & Trecker Corp.* v. *Giddings & Lewis, Inc.*, 296 F. Supp. 979, 982 (E.D. Wis. 1969); *Bourget* v. *Government Employees Ins. Co.*, 48 F.R.D. 29, 33 (D. Conn. 1969); *Gulf Constr. Co.* v. *St. Joe Paper Co.*, 24 F.R.D. 411, 414-415 (S.D. Tex. 1959). Cf. *Special Grand Jury*, slip op. at 2 n.1, 3 n.3.

Finally we observe that the client, an intended beneficiary of the *Hickman* doctrine, does not here assert any claim thereunder, and there has been a waiver of any attorney-client privilege.

Thus several factors cumulate to render "work product" an inadequate basis for excusing the production. In reaching this conclusion, we are not to be understood as saying that the work product idea, or some implication from it, can never apply in a legislative investigation. It is fair to add, however, that we have not yet seen a decision where work product has been applied in that context.[13]

---

[13] The resolve states that "all provisions of law relative to summonses issued in [criminal] cases shall apply to summonses under this resolve so

(d) *Privacy in relation to relevance.* To the characterization "work product" which he attached to category (6), the judge added "overbroad"; he characterized category (8) as outside the resolve and overbroad; and in two categories, (4) and (9), he restated and reduced the scope of the materials to be produced, evidently for the reason that he thought the categories as described in the summons to be overbroad. In speaking of overbreadth, the judge was evidently concerned with irrelevance, not with any lack of the particularity of the demands. We thought that a second, closer look was called for on this question if the Commission should elect to request it.

In respect to relevance, we suggested in the Order that privacy interests of the respondent and possibly of others should be considered. We now speak of privacy in the general sense of a right belonging to every person, not in the special sense in which it appears in discussions of the *Hickman* rule. We indicated (as noted above) that as the relevance of a document or part of it was seen to be attenuated or remote, the existence of a personal interest in nondisclosure might well persuade a court against ordering production.

It seems to us on a review of the cases that such a humane factor has long entered into decisions about relevance in relation to legislative investigations. See *Finance Comm'n of Boston* v. *McGrath,* 343 Mass. 754, 761 (1962) (courts should refrain from helping a commission "improperly to invade the witness's privacy to the extent that privacy is constitutionally protected"); *Burnham* v. *Morrissey,* 14 Gray 226, 241 (1859) (witness's privacy protected by limiting range of required production); *Watkins* v. *United States,* 354 U.S. 178, 204 (1957) ("[r]emoteness of subject can be aggravated by a probe for a depth of detail even farther removed from any basis of legislative action"); *Sweezy*

---

far as applicable." Massachusetts Rule of Criminal Procedure 14 (a) (5), 378 Mass. 876 (1979), exempts "work product" as there defined from pretrial discovery by a party to a criminal case. For the reasons we have suggested, the rule is not "applicable" here.

v. *New Hampshire,* 354 U.S. 234, 248 (1957) ("[the investigator] delved minutely into the past conduct of petitioner thereby making his private life a matter of public record"). See also Kalven, Meikeljohn and the Barenblatt Opinion, 27 U. Chi. L. Rev. 315, 327 (1960); Redlich, Rights of Witnesses Before Congressional Committees: Effects of Recent Supreme Court Decisions, 36 N.Y.U.L. Rev. 1126, 1148-1150 (1961); T. Taylor, Grand Inquest: The Story of Congressional Investigations 172 (1955). Sometimes this point about privacy as a qualifier of relevance has not been made the express basis of decision but can be perceived to have entered into narrowing interpretations of the scope of resolutions authorizing investigations (see *United States* v. *Rumely,* 354 U.S. 41, 46 [1953]), or into demands for greater clarity or particularity in the resolutions if they were to be made the basis for compulsory process. See *Sweezy* v. *New Hampshire, supra* at 253; *Watkins* v. *United States, supra* at 187.[14]

In the present case privacy interests might become a factor in decision as the categories or items mentioned seek information that may shade into slight relevance, while possibly exposing personal relationships of no concern to legitimate investigation. The respondent would be entitled to press such privacy considerations if the Commission applied in the Superior Court for enforcement of those parts of the summons.

A rescript will enter.

---

[14] Privacy concerns may have motivated judicial efforts to divine the "true" purposes of the questioning bodies. See *McGrain* v. *Daugherty,* 273 U.S. 135, 178 (1927); *Hutcheson* v. *United States,* 369 U.S. 599, 624 (1962) (Brennan, J., concurring in the judgment); *United States* v. *Cross,* 170 F. Supp. 303, 306 (D.D.C. 1959).