FINANCE COMMISSION OF THE CITY OF BOSTON *vs.*
JOHN J. McGRATH.

Suffolk.    February 8, 1962. — March 12, 1962.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & KIRK, JJ.

*Boston Finance Commission. Investigating Body. Equity Jurisdiction,*
To compel giving evidence before Boston Finance Commission, Retention
of suit for further relief.   *Municipal Corporations,* Officers and agents.
*Witness,* Subpoena.   *Constitutional Law,* Subpoena.   *Evidence,* Income
tax return.   *Equity Pleading and Practice,* Judicial discretion, Decree.

A proceeding in the Superior Court by the Boston Finance Commission
under St. 1908, c. 562, § 3, to compel the attendance of a person and
the production of records before the commission following the service of
a subpoena duces tecum upon him was in equity.   [757–758]
Discussion of the scope and methods of investigations by the Boston
Finance Commission under St. 1909, c. 486, § 18.   [760–762]
Inquiry was made by the Boston Finance Commission about a parcel of
foreclosed tax title land in the city sold by its auctioneer in his official
capacity to a straw of his and later conveyed by the straw to him, in-
cluding inquiry into appeals to the Appellate Tax Board seeking abate-
ment of taxes on the parcel. Inquiry also was made about a parcel of
land which, after the Boston Housing Authority had applied for Fed-
eral funds to take it, was conveyed to the person acting as straw for
the auctioneer in connection with the other parcel and subsequently was
acquired by the authority. Such inquiries were held to be within the
scope of the commission's powers of investigation under St. 1909, c. 486,
§ 18, so that the auctioneer must give testimony and produce records
within his control relevant to such matters before the commission.
[762–764]
A subpoena duces tecum issued by the Boston Finance Commission which,
properly interpreted, required production of such records pertaining to
specified bank accounts as were relevant to certain matters under inves-
tigation by the commission, during a period of time reasonable in rela-
tion to such matters, was not too broad.   [764–766]
One served with a subpoena duces tecum to produce specified records was
not required to produce such records not within his control.   [766]
In a proceeding by the Boston Finance Commission under St. 1908, c. 562,
§ 3, seeking an order for the production of records following service on
the defendant of a subpoena duces tecum calling for the production by
him of records respecting bank accounts in his name or that "of any
person acting as . . . [his] nominee," the order by the judge was too
narrow in specifying only one such "nominee" and in excluding "nomi-
nees as yet unnamed or [not] indicated"; but on the record there was no

abuse of discretion in that the order did not require production of copies of the defendant's Federal income tax returns, also called for by the subpoena. [766-768]

The order of testimony before the Boston Finance Commission in the course of an investigation by it is within its discretion. [768]

In a proceeding by the Boston Finance Commission under St. 1908, c. 562, § 3, to compel the defendant's attendance and the production of records before the commission in the course of an investigation, the trial court was directed to provide, in a decree after rescript affording such relief, for retention of jurisdiction in order to facilitate the obtaining of further relief by the parties. [768]

BILL IN EQUITY, filed in the Superior Court on October 23, 1961.

The suit was heard by *Cahill, J.*

*Arthur M. Gilman,* (*Charles S. McLaughlin* with him,) for the defendant.

*Gael Mahony,* for the plaintiff.

CUTTER, J. On October 11, 1961, the Finance Commission of Boston (St. 1909, c. 486, §§ 17–21[1]) began an investigation announced by the commission's chairman at the opening hearing as "called to study certain allegations against the official conduct of John J. McGrath, auctioneer of the city . . . more specifically . . . questions . . . as to . . . [his] conduct" relating to "about 1,350,360 square feet of land" in Hyde Park. The transcript[2] of these hear-

---

[1] Section 18 provides that it "shall be the duty of the . . . commission from time to time to investigate *any and all* matters *relating* to appropriations, loans, expenditures, accounts, and methods of administration *affecting* the city of Boston or the county of Suffolk, or any department thereof, that *may appear to the commission* to require investigation, and to report thereon from time to time to the mayor, the city council, the governor, or the general court. The commission shall make an annual report . . . to the general court" (emphasis supplied). See *Kaplan* v. *Sullivan,* 290 Mass. 67, 68–69. By § 21, the commission is given all the powers and duties conferred upon an earlier commission mentioned in St. 1908, c. 562, subject to a provision that "counsel for any witness at any public hearing may ask him any pertinent question and may offer pertinent evidence through other witnesses subject to cross-examination by the commission and its counsel." Statute 1908, c. 562, § 2, gave the 1908 commission power (a) "to require the attendance and testimony of witnesses and the production of . . . books . . . and documents relating to any matter within the scope of the . . . investigation, or which may be material in the performance of the duties" of the commission; (b) to administer oaths; and (c) to "prescribe reasonable rules . . . for the conduct of hearings and the giving of testimony."

[2] The transcript was introduced as an exhibit in this case and was incorporated by reference in the judge's findings.

ings, which took place on October 11, 16, 17, 18, 19, 20, 23, 24, and 25, covers 1,108 typewritten pages. The commission heard a number of witnesses including McGrath, who on "various days up to and including October 20, 1961 . . . appeared . . . voluntarily."

On October 20, McGrath was served with a subpoena duces tecum, which gives rise to this controversy. The second paragraph of this subpoena (which showed the title of the proceedings as "In the matter of an investigation of the official conduct of John J. McGrath, city auctioneer") required production of "all records of every description including bank statements and cancelled checks in connection with checking accounts, pass books for accounts in savings banks, savings and loan associations, cooperative banks and similar savings institutions, with respect to accounts in the names, individually or jointly, of John J. McGrath, Mary A. McGrath, or of any person acting as your nominee during the period from 1950 to 1961 inclusive; and . . . copies of your personal income tax returns, both federal and state, for the years 1950 to 1961, inclusive."

On October 23, McGrath (through his counsel) informed the commission that "he would not produce the records called for by the subpoena and . . . left the hearing, refusing to testify further." A bill in equity was brought by the members of the commission to compel McGrath's attendance and the production of the records. After hearing, a Superior Court judge denied McGrath's "motion to dismiss" the bill. He also made a report of material facts and filed an order for a decree. On November 2, 1961, a final decree, entitled "order," was entered directing McGrath to appear before the commission on November 15, and then to "produce all records of every description pertaining to such matters as are now being investigated by the . . . [commission], including bank statements and cancelled checks in connection with checking accounts, passbooks for accounts in savings banks, savings and loan associations, co-operative banks and similar institutions, with respect to accounts in the names, individually or jointly, of John J.

McGrath, Mary A. McGrath or of the Richview Trust during the period from 1950 to 1961 inclusive.'' Both the commission and McGrath appealed from the final decree. McGrath also filed a bill of exceptions. All matters raised by the bill of exceptions are presented by the appeals, if they are properly before us. The evidence is reported.

1. The bill is brought under St. 1908, c. 562, § 3, which reads, ''If any person so summoned [before the commission] . . . shall refuse to attend . . . or to answer any question, or to produce any book, contract, document or paper pertinent to the matter of inquiry . . ., a justice of the supreme judicial court or of the superior court, *in his discretion,* upon application by the commission . . ., may issue an order requiring such person to appear before the commission, and to produce his books, contracts, documents and papers and to give evidence touching the matter in question. Any failure to obey such order of the court may be punished by such court as a contempt thereof'' (emphasis supplied).

This is a special statutory proceeding. One application of this general character (under a legislative resolve) seems to have been dealt with on the equity side of the Superior Court (*Cabot* v. *Corcoran,* 332 Mass. 44, 52). Resort also has been had to the law side of the court. See *Attorney Gen.* v. *Brissenden,* 271 Mass. 172, 175. See also *First Natl. Bank* v. *Graham,* 175 Mass. 179; *Massachusetts Bonding & Ins. Co.* v. *Commissioner of Ins.* 329 Mass. 265, 279; Wigmore, Evidence (McNaughton rev.) § 2195 et seq. The foregoing cases do not discuss the issue whether the statutory proceedings were equitable or legal.

The 1908 statute does not state the nature of the proceeding. There is no occasion to restrict its usefulness by confining it within the scope of any particular preëxisting remedy. The Legislature, by implication, has left the courts free reasonably to assimilate the special statutory proceeding to any appropriate established procedures. There is, perhaps, some resemblance between this statutory procedure and an equitable bill for discovery in aid of another

proceeding. See *MacPherson* v. *Boston Edison Co.* 336
Mass. 94, 98–103. In some cases applications for enforce-
ment may involve some element of declaratory relief, which
in most cases is granted on the equity side of the court.
See G. L. c. 231A (inserted by St. 1945, c. 582, § 1). Appli-
cations for enforcement of administrative process also are
likely to be met with assertions of personal constitutional
rights and immunities of a character involving careful bal-
ancing of public and private interests. Each such interest
can be more effectively protected by the flexible procedures
and remedies and the broader appellate review available in
equity than by a proceeding at law. All relevant considera-
tions thus make it appropriate for us to treat the proceed-
ing as governed by equitable procedure and principles, so
far as reasonably applicable.

The "motion to dismiss," treated as a demurrer (see
*Maltzman* v. *Hertz*, 336 Mass. 704, 705), was properly over-
ruled. The only grounds stated in the motion were (a)
that the petition could only be brought at law, a matter
dealt with above; and (b) that the proceeding before the
commission was "invalid" and the subpoena "a nullity."
The allegations of the bill were sufficient to establish juris-
diction in the commission to make investigation of at least
some of McGrath's activities.

2. The following statement of parts of the evidence be-
fore the commission is based upon the trial judge's sum-
maries, supplemented by a few references to the testimony
itself.

(a) On August 10, 1950, McGrath "sold to John J. Ellis,
his straw, for $5,500, while acting in his official capacity as
[c]ity [a]uctioneer" a parcel of foreclosed tax title land in
Hyde Park containing 1,350,360 square feet. For this
McGrath made a cash deposit of $500 with his then supe-
rior, one Carp, chairman of the city's board of real estate
commissioners, "the only other person present at the sale.
[The b]alance of the . . . price was to be paid by Septem-
ber 9, 1950; but was not paid until March 7, 1952.[3]    On

---

[3] McGrath testified that no taxes on the land were paid by him from 1951
until 1961.

March 26, 1952, a deed'' to Ellis was recorded. ''[T]he property remained in his name until November 20, 1957, when a deed, dated November 16, 1954, was recorded, revealing . . . [McGrath] as the owner.'' Revenue stamps on this deed indicated a sale by Ellis to McGrath for $25,000 ''although no money had been passed. On December 11, 1958 . . . [McGrath] caused to be recorded a mortgage'' to the trustees of the ''Richview Trust,[4] to secure what purported to be a $75,000 note which . . . did not exist.'' In 1960, the metropolitan district commission took about 298,000 square feet of the Hyde Park land. McGrath refused the appraised price of $15,000, and has had offers of $15,000 to $60,000 for the entire lot.

McGrath's counsel refused to permit him to testify before the commission about using Ellis as ''straw'' in any other transaction. Although counsel allowed McGrath to give testimony about applications to the Boston assessors for abatement of taxes upon the Hyde Park property, McGrath did not testify about appeals from the assessors to the Appellate Tax Board. After the service of the subpoena, McGrath's counsel told the commission that he was ''withdrawing . . . [his] client as a witness'' and that the commission should ''proceed with a court adjudication of . . . [its] rights.''

(b) In November, 1950, the Boston housing authority applied for Federal funds to take a parcel of land on Popes Hill Street, Dorchester. This action ''was unknown to the general public.'' On March 14, 1951, the parcel was conveyed to Ellis for $4,500. On November 27, 1951, a taking of the property by the housing authority was recorded. About a year later, the authority secured an option to purchase the property for $13,300. A check for $13,147.87 was sent to Ellis at McGrath's office on April 15, 1953. On April 9, 1953, papers had been passed by the authority and Ellis, who was then accompanied by one Swinderman. There was a bookkeeper and stenographer named Swenderman in McGrath's office. Ellis was an elevator operator

---

[4] McGrath's testimony before the commission indicated that he established the Richview Trust, of which he and his wife were trustees.

of limited means.   An officer of the bank upon which the
check for $13,147.87 was drawn was unable to furnish in-
formation about its cashing or disposition.[5]

McGrath contends that, in large measure, the commission
is investigating McGrath's individual activities rather than
his official conduct; and that the commission is exceeding its
statutory scope of inquiry.   In particular, McGrath objects
to any inquiry about tax appeals, relating to the Hyde Park
land, before the Appellate Tax Board and to questions
about the Dorchester land which the Boston housing author-
ity has acquired.

Section 18 of the 1909 statute (see footnote 1, *supra*)
gives the commission authority "to investigate *any and all
matters* relating to appropriations . . . accounts, and meth-
ods of administration *affecting* . . . Boston or the county
of Suffolk, or any department thereof" (emphasis sup-
plied).   This statutory language shows that the Legisla-
ture intended the commission's range of inquiry to be
broad, as was that of (a) the predecessor commission exist-
ing under orders of the Boston city council entered on Jan-
uary 29, 1907, as amended, March 7, 1907 (see 1 [Boston]
Fin. Com. Rep. 1–10; St. 1907, c. 481) and (b) the commis-
sion created by St. 1908, c. 562 (footnote 1, *supra*).   See
communications early in 1908 from the then existing finance
commission to a committee of the Legislature, 1 Fin. Com.
Rep. 209–210, 244–245.   Section 18 amply empowers the
commission (as a continuing independent body charged with
watching city operations constantly and reporting what it
observes to "the mayor, the city council, the governor or
the general court," as may be appropriate) to investigate
at least those matters which, in its opinion entertained rea-
sonably, have substantial relevance to the proper manage-
ment of the city's affairs and the appropriate conduct of
city employees in relation to matters in which the city has
an interest.

[5] There was also disputed testimony before the commission that McGrath
sold a parcel in the Readville section of Hyde Park in May, 1961.   One Prata
"attended the sale" but the parcel "was sold to one Losordo for $300 with-
out affording Prata a chance to bid, although he was prepared to bid $350
. . . and . . . to go as high as $1500 if he had to."   The commission is con-
tinuing its investigation of this sale.

Statute 1908, c. 562, § 2, which is incorporated by reference in St. 1909, c. 486, § 21 (see footnote 1, *supra*), provides that the commission, in conducting investigations, may summon witnesses and compel the production of documents "to enable the general court to receive . . . [the commission's] findings and recommendations as a basis for such laws relating to the government of said city as the general court shall deem meet to enact," as well as to enable the commission (St. 1908, c. 562, § 1) "to inform itself." The commission's position thus in these respects is analogous to that of a legislative committee.

The commission's range of inquiry is not unlimited. The statutes indicate that its investigations must have a reasonable relation to the finances and methods of management of the city. Except as individual situations arise, however, it is not either possible or appropriate to be precise in defining what the commission may examine. Questions of the scope of jurisdiction to inquire and of relevance (see Wigmore, Evidence [3d ed.] § 27) almost invariably involve questions of judgment in particular circumstances, especially as to (a) administrative boards and (b) legislative inquiries in aid of possible legislation. See *Attorney Gen.* v. *Brissenden,* 271 Mass. 172, 177–180, 184–185, and cases cited; *Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S. 186, 209; *Barenblatt* v. *United States,* 360 U. S. 109, 125–134. Compare *United States* v. *Rumely,* 345 U. S. 41, 42–47, where a Congressional resolution was narrowly construed in order to avoid constitutional questions, not here present.

The courts, of course, should not assist the commission to obtain the production of plainly irrelevant records, or improperly to invade witnesses' privacy to the extent that privacy is constitutionally protected. See *Stahlman* v. *Federal Communications Commn.* 126 F. 2d 124, 128 (Ct. App. D. C.). See also *Federal Trade Commn.* v. *American Tobacco Co.* 264 U. S. 298, 305–307; *Jones* v. *Securities & Exch. Commn.* 298 U. S. 1, 25–27; Frankfurter, J. dissenting in *Penfield Co.* v. *Securities & Exch. Commn.* 330 U. S. 585, 604, and cases there collected. Compare *United States* v.

*Morton Salt Co.* 338 U. S. 632, 641–642. Nevertheless, the commission may not be denied the power to investigate fairly, by comprehensive but reasonable methods, matters which it is justified in regarding as affecting the finances and management of Boston. In the first instance, subject to judicial determination whether subpoenas may properly be enforced (see discussion of St. 1908, c. 562, § 3, in part 6 of this opinion, *infra*), the statutes leave to the commission the determination whether the inquiry is relevant to the statutory functions, and whether particular methods of inquiry are necessary. See *Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S. 186, 194 et seq., 208–209, 214; *Barenblatt* v. *United States,* 360 U. S. 109, 125–134; *McPhaul* v. *United States,* 364 U. S. 372, 380–382. See also *Endicott Johnson Corp.* v. *Perkins,* 317 U. S. 501, 507–510; *Dossett* v. *Porter,* 161 F. 2d 839, 842 (6th Cir.) cert. den. 332 U. S. 771; *Hunt Foods & Indus. Inc.* v. *Federal Trade Commn.* 286 F. 2d 803, 806–809 (9th Cir.), cert. den. 365 U. S. 877; *Long Beach Fed. Sav. & Loan Assn.* v. *Federal Home Loan Bank Bd.* 189 F. Supp. 589, 602–605 (D. Cal.).

The Legislature has shown that it intends that the commission's inquiries shall be fairly and reasonably conducted and that witnesses shall have opportunity to bring out relevant facts and to protect their reputations by cross-examination and offering testimony. See St. 1909, c. 486, § 21, footnote 1, *supra.* The duty to testify before the commission is subject to relevant constitutional guaranties. See St. 1908, c. 562, § 7.

3. McGrath must answer questions and produce records relating to his appeals to the Appellate Tax Board under G. L. c. 59, §§ 64–65D, as amended, from assessments upon the Hyde Park property. The commission could reasonably consider that Boston or its interests might be affected by McGrath's alleged conduct with respect to the Hyde Park land, even if he was only a part time[6] city employee. It could investigate all relevant aspects of such conduct.

---

[6] The commission's counsel conceded at the arguments that McGrath either was a part time city employee or was not barred from engaging in other business activity.

The proceedings before the Appellate Tax Board are against the Boston assessors, are defended by city lawyers, and relate to taxes paid to the city collector. In addition to these obvious facts, there might be further reason to ascertain whether there has been abuse of the statutory procedures before the board, or failure to comply with conditions precedent to initiating the appeals e.g. payment of taxes, see G. L. c. 59, § 64, as amended through St. 1956, c. 544, and § 65, as amended through St. 1945, c. 621, § 6.

4. We have said that, under the statutes (see G. L. c. 121, §§ 26I–26OO, as amended), a housing authority, "although organized by and in each city and town in coöperation with the State, is nevertheless, when organized, a complete corporate entity in itself, distinct from the municipal corporation within whose territory it is set up." See *Johnson-Foster Co.* v. *D'Amore Constr. Co.* 314 Mass. 416, 419. Such an authority, or any similar authority for other purposes, is a public body, analogous in various respects (see *Costonis* v. *Medford Housing Authy., ante,* 108, 115; see also *Ayer* v. *Commissioner of Admn. & Fin.* 340 Mass. 586, 592–595) to a municipal corporation. In substantial respects, such an authority may vitally affect the interests of the community or communities in which its functions are executed. Under G. L. c. 121, § 26K (as amended through St. 1954, c. 72, §§ 1, 2) the city initiates the operations of a housing authority. Its members (see § 26L, as amended through St. 1961, c. 496, § 1) are in part appointed by the mayor, who under § 26M (as amended through St. 1955, c. 128, § 2) has certain powers of removal. Under § 26N, inserted by St. 1946, c. 574, § 1, "So far as practicable, a housing authority shall make use of the services of the agencies, officers and employees of the city . . . and such city . . . shall, if requested, make available such services." The city has power to assist its housing authority to carry out its functions. See § 26Q, as amended through St. 1961, c. 188, § 2. The housing authority's real estate and tangible personalty are exempt from local taxation, subject, however, to arrangements for payments in lieu of taxes. See

§ 26R (inserted by St. 1946, c. 574, § 1). These statutory provisions are examples of areas in which a housing authority's operations are inevitably interwoven with the management and interests of the city in which it operates. Even without such explicit provisions, the operations of such an authority might be, in some degree, matters "affecting" the city. See St. 1909, c. 486, § 18 (footnote 1, *supra*).

In the light of these considerations, the commission is justified in investigating whether a Boston employee, having responsibilities relating to city real estate (and, perhaps, in a position to learn about the authority's plans and real estate needs) has acted in a manner likely to involve conflict between the employee's private real estate operations and his public duties. McGrath must answer questions, and produce documents, relevant to any dealings affecting the Boston housing authority.

5. We interpret the subpoena (apart from its demand for copies of tax returns, discussed *infra*), as calling only for such "records of every description . . . with respect to bank accounts in the names, individually or jointly, of John J. McGrath, Mary A. McGrath, or of any person acting as . . . [McGrath's] nominee during the period from 1950 to 1961 inclusive," as were relevant to the inquiries into McGrath's activities. The trial judge, by the final decree, required McGrath to produce only those records of bank accounts "pertaining to such matters as are . . . being investigated by the" commission. Those matters specifically brought to the judge's attention were the Hyde Park and Dorchester land matters and the Readville auction matter (see footnote 5, *supra*).

McGrath contends that the subpoena is so broad as to be unlawful and an unreasonable search and seizure. The commission, on the other hand, contends that the judge has unreasonably excluded records of bank accounts of McGrath's "nominees" from the scope of the subpoena, as well as copies of certain Federal tax returns.

No actual search or seizure of documents, pursuant to a warrant, is proposed. The question (both under the Fourth

and Fourteenth Amendments of the Constitution of the United States, and, under Art. 14 of the Declaration of Rights of the Constitution of the Commonwealth) is whether the subpoena, fairly interpreted, is too broad and, therefore, unreasonable. If it is unreasonable, it must be quashed or modified. See *Hale* v. *Henkel,* 201 U. S. 43, 70–77; *Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S. 186, 195, 202, 208–209; *McPhaul* v. *United States,* 364 U. S. 372, 382–383; *McGarry* v. *Securities & Exch. Commn.* 147 F. 2d 389, 392 (10th Cir.); *Goldberg* v. *Truck Drivers Local Union No. 299,* 293 F. 2d 807, 814–815 (6th Cir.), and cases cited.

In the *McPhaul* case, 364 U. S. 372, 382, the Supreme Court said: ''The . . . inquiry . . . was . . . relatively broad . . . and the permissible scope of materials that could reasonably be sought was necessarily equally broad. It is not reasonable to suppose that the Subcommittee [there making the inquiry] knew precisely what books and records were kept . . . and therefore the subpoena could only 'specif[y] . . . the subjects to which the documents . . . relate' . . . . The call of the subpoena for 'all records, correspondence and memoranda' . . . relating to . . . specified subjects describes them'' as precisely as the situation would permit and sufficiently to enable the person served to know what documents were required and to select them.

We are of opinion that the subpoena, as interpreted by the trial judge, does not exceed reasonable limits. (a) It is reasonable in time. McGrath's activities with respect to the Hyde Park land began in 1950 and are still continuing. If he was interested in the Dorchester land, his and Ellis's activities concerning that land took place in the years 1951 through 1953. (b) The documents asked for are susceptible of identification. McGrath can ascertain what bank accounts, he, Mrs. McGrath, and the Richview Trust have had during the last decade. To the extent that records of these still exist, it is unlikely that they are unreasonably voluminous. (c) The records cannot be said to lack relevance to the inquiry, particularly to the inquiry about the

Dorchester land, for they may reflect whether McGrath has received particular payments at particular times.

The subpoena cannot require McGrath to produce documents not now within his possession or reasonable control. He may raise questions with respect to such possession or control before the commission, if he is unable to produce a particular record. See *McPhaul* v. *United States,* 272 F. 2d 627, 630 (6th Cir.), aff'd 364 U. S. 372; 8 Wigmore, Evidence (McNaughton rev.) § 2200, p. 129. See also *McGarry* v. *Securities & Exch. Commn.* 147 F. 2d 389, 392– 393 (10th Cir.). The subpoena and the judge's order, of course, leave open to McGrath ''ample opportunities for objecting, on relevant grounds, to the admissibility . . . of any particular document.'' See *Civil Aeronautics Bd.* v. *Hermann,* 353 U. S. 322, 324.

In one respect the trial judge's order is too narrow. He limited McGrath's obligation to produce records of bank accounts of his ''nominees'' to those of the Richview Trust (see footnote 4, *supra*) but excluded ''those of nominees as yet unnamed or [not] indicated.'' To the extent that McGrath actually operated through ''nominees'' or agents in respect of matters being investigated, their bank account records may be relevant. In addition to the Richview Trust, McGrath has been shown to have operated through Ellis as a ''straw.'' If he had other nominees, they would bear a similar agency or fiduciary relationship to him. We think that the commission is entitled to have McGrath produce his nominees' records of bank accounts so far as they relate to the subject of investigation and are within McGrath's control.

6. The commission properly no longer seeks the production of copies of McGrath's Massachusetts tax returns. *Leave* v. *Boston Elev. Ry.* 306 Mass. 391, 398–403. Compare *Cavazza* v. *Cavazza,* 317 Mass. 200, 202–203. The copies of McGrath's Federal tax returns stand on a somewhat different basis. In a very recent case (decided since the final decree in the Superior Court), the Supreme Court of the United States has indicated that copies of Federal

tax returns in the hands of the taxpayer are "subject to discovery." See *St. Regis Paper Co.* v. *United States,* 368 U. S. 208, 218–219. Such production, of course, should be allowed only where the information in the returns is relevant to some legitimate subject of inquiry or issue in the proceeding. See *Tollefsen* v. *Phillips,* 16 F. R. D. 348, 349 (D. Mass.). See also *June* v. *George C. Peterson Co.* 155 F. 2d 963, 967 (7th Cir.); *Fidelity & Cas. Co. Inc.* v. *Tar Asphalt Trucking Co. Inc.* 30 F. Supp. 216, 217 (D. N. J.); *In re Schwartzman,* 58 F. Supp. 180 (E. D. N. Y.); *Court Degraw Theatre, Inc.* v. *Loew's, Inc.* 20 F. R. D. 85, 86 (E. D. N. Y.); *Kingsley* v. *Delaware L. & W. R.R.* 20 F. R. D. 156, 158–159 (S. D. N. Y.); *Biedler* v. *Hurst,* 57–2 U. S. T. C. 57679 (E. D. Pa.); *Currier* v. *Allied N. H. Gas Co.* 101 N. H. 205, 206–207 ("discovery of federal . . . tax returns is discretionary . . . but it should not be used as a means of harassment or impertinent intrusion"); 8 Wigmore, Evidence (McNaughton rev.) § 2377 (f), pp. 781–782; McCormick, Evidence, § 149, p. 312. Compare *United Motion Theatre Co.* v. *Ealand,* 199 F. 2d 371 (6th Cir.); *Garrett* v. *Faust,* 8 F. R. D. 556, 557 (E. D. Pa.), where the court held that the plaintiffs had "not shown any necessity for . . . production of" tax return copies or that they were "reasonably calculated to lead to discovery of admissible evidence." Compare also *Webb* v. *Standard Oil Co. of Cal.* 49 Cal. 2d 509, 512–513. In the Federal courts, a taxpayer who does not have a copy of his Federal tax return may even be required to request one from the Internal Revenue Service as he is entitled to do. See the *Tollefsen* case, 16 F. R. D. 348; *Paramount Film Distrib. Co.* v. *Ram,* 91 F. Supp. 778, 781 (E. D. S. C.).

As to copies of Federal returns (despite our preference for the reasoning in the *Leave* case, 306 Mass. 391, 398–403), we would follow the Federal decisions if substantial necessity for production of the copies had been established. If these later are shown to be of real significance, the commission will be entitled to have them produced, subject to the limits of the trial judge's "discretion" mentioned in

St. 1908, c. 562, § 3, incorporated by reference in St. 1909, c. 486, § 21 (and quoted in part 1 of this opinion, *supra*). Section 3 of the 1908 statute gives the trial judge some range of discretion to refuse to order production of documents. Like other discretions, this discretion cannot be exercised arbitrarily, but a trial judge, before ordering the production of documents, at least may require the commission to demonstrate that the investigation is within its powers, and that the information sought is relevant. We are of opinion that the trial judge, upon the showing made to him at this stage of the inquiry, correctly exercised his discretion to deny production of copies of McGrath's Federal tax returns.

7. McGrath principally complains of the scope of inquiry rather than of the conduct of the hearings. He, however, does argue that the commission unduly delayed and interrupted his scheduled testimony. The order of testimony was within the commission's sound discretion, although any such body naturally will avoid, so far as practicable, unnecessary inconvenience to witnesses. See *Horowitz* v. *Bokron,* 337 Mass. 739, 742. See also *Goldman* v. *Ashkins,* 266 Mass. 374, 379–380.

8. This seems to us to be a case in which, as the inquiry proceeds, there may be occasion for further resort to the Superior Court to compel testimony or the production of documents. The propriety of various inquiries may require prompt resolution to protect the proper interests of the public and of McGrath. See *Hermann* v. *Civil Aeronautics Bd.* 237 F. 2d 359, 363–364 (9th Cir.), revd. as to issues not in this respect material, sub nom. *Civil Aeronautics Bd.* v. *Hermann,* 353 U. S. 322, 323-324. Accordingly, the Superior Court, in its decree after rescript, will retain jurisdiction, with leave to the parties to apply, by further petition or by motion, and upon short notice, for additional relief as occasion may arise. See *Nassif* v. *Boston & Maine R.R.* 340 Mass. 557, 566, and cases cited; *Hunt Foods & Indus. Inc.* v. *Federal Trade Commn.* 286 F. 2d 803, 811, 813 (9th Cir.), cert. den. 365 U. S. 877.

9.   The final decree is to be modified to provide (a) for the production of records of bank accounts of any nominee of McGrath, to the extent that such records are relevant to any proper subject of the commission's inquiry and are within McGrath's possession or control, and (b) for the retention of jurisdiction by the Superior Court, in the manner outlined in this opinion.   Subject to such modifications, the final decree is affirmed.   Because all issues have been dealt with upon the appeals, the bill of exceptions is dismissed.

*So ordered.*