# WARREN JEPSON *vs.* ZONING BOARD OF APPEALS OF IPSWICH & another[1] (and a consolidated case[2]).

Essex. October 2, 2007. - November 20, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Housing. Zoning,* Comprehensive permit, Low and moderate income housing, Commercial, Person aggrieved, Conditions, Wetlands. *Practice, Civil,* Standing. *Housing Authority. Wetlands Protection Act.*

In a civil action challenging the decision of a local zoning board of appeals to grant a comprehensive permit pursuant to G. L. c. 40B for an affordable housing development, the judge erred in granting standing to an abutter to the property at issue on the theory that his own property might suffer diminution in value as a result of the development; however, the abutter had standing based on the issue of flooding to his property, which constituted an injury to an interest that G. L. c. 40B was intended to protect. [87-92]

In a civil action brought by two plaintiffs challenging a decision of a local zoning board of appeals (board) to grant a comprehensive permit pursuant to G. L. c. 40B for an affordable housing development, this court concluded that the first plaintiff, a municipal housing authority that was an abutter to the project, could be a "person" for purposes of standing under G. L. c. 40B, § 21; however, this court declined to consider whether the housing authority qualified as a "person aggrieved," where the second plaintiff had standing to contest the board's action. [92-93]

In granting a comprehensive permit pursuant to G. L. c. 40B for an affordable housing development that included an incidental commercial use, a local zoning board of appeals had the authority to override local bylaw dimensional requirements [93-95]; further, the judge applied the correct legal standard to review the merits of the plaintiffs' complaint [95-96], and the judge's acceptance of the position of the Department of Environmental Protection on the effectiveness of the housing development's storm water management system was not unreasonable, arbitrary, or capricious [96].

CIVIL ACTIONS commenced in the Superior Court Department on November 2 and 3, 2004.

After consolidation, the case was heard by *Diane M. Kottmyer,* J., on motions for summary judgment.

---

[1]YMCA of the North Shore, Inc.

[2]Ipswich Housing Authority *vs.* Zoning Board of Appeals of Ipswich & another.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Catherine J. Savoie (Todd L. Tisdale* with her) for Warren Jepson.

*Michael A. Tucker* for Ipswich Housing Authority.

*Howard M. Brown (Thomas M. Looney* with him) for YMCA of the North Shore, Inc.

The following submitted briefs for amici curiae:

*Michael E. Malamut, Martin J. Newhouse, & Jo Ann Shotwell Kaplan* for New England Legal Foundation.

*Jeffrey W. Sacks, Jeffrey S. Brenner, & Stephen M. LaRose* for Citizens' Housing & Planning Association & another.

GREANEY, J. We transferred these cases here on our motion to decide whether a local board of appeals, when granting a comprehensive permit under G. L. c. 40B, §§ 20-23, may override local zoning requirements when a *commercial* use is included within an affordable housing development. We also consider claims of standing, including whether a municipal housing authority, which is an abutter to an affordable housing development, has standing to challenge the grant of a comprehensive permit. We conclude that one of the plaintiffs here had standing and that the zoning board of appeals (board) of Ipswich (town) did not exceed its authority in overriding local zoning requirements for the commercial component of the affordable housing development at issue.

The background of the case is as follows. The defendant YMCA of the North Shore, Inc. (YMCA), is a nonprofit organization that owns slightly over two acres of land[3] located at 108 and 112 County Road (on Routes 1A and 133) in Ipswich (property). The plaintiffs, Warren Jepson and the Ipswich Housing Authority (housing authority), are abutters to the property entitled to notice under G. L. c. 40B, § 21, and G. L. c. 40A, § 11.[4] Jepson owns, and resides on, property that is adjacent to 108 County Road. The housing authority owns property directly

---

[3] The exact amount of land is disputed. The YMCA states that the property comprises 2.36 acres, but Jepson points to survey plans filed by the YMCA that indicate the land comprises only 2.02 acres. Any discrepancy is not material to this appeal.

[4] As explained in *Standerwick* v. *Zoning Bd. of Appeals of Andover*, 447

across the street from the YMCA's property. On some of its property, the housing authority operates eighty units of subsidized elderly housing and fourteen units of affordable family housing.

In January, 2004, the YMCA applied to the board for a comprehensive permit to build forty-eight rental units of low and moderate income residential housing in two separate structures on the property,[5] and to include within the structure at 112 County Road approximately 8,220 square feet of commercial space. The project is referred to as the Powder House Village development. Generally, the project involves the removal of existing structures on the property and the construction of two new structures, associated parking, pedestrian walkways, storm water drainage systems, and utilities.

Each new structure will be three stories in height. The proposed structure at 108 County Road contemplates only residential use, comprising thirty units (six one-bedroom units, sixteen two-bedroom units, and eight three-bedroom units). The proposed structure at 112 Country Road will involve the construction of a mixed-use structure, consisting of both residential and commercial uses. The structure will contain eighteen residential units (four one-bedroom units, eight two-bedroom units, and six three-bedroom units). In addition, the structure will contain approximately 8,220 square feet of commercial space on the first floor. For this space, the YMCA proposes a YMCA child care facility that will occupy 3,970 square feet, a bank with a drive-up teller window, and a coffee shop or similar

---

Mass. 20, 33 n.17 (2006) (*Standerwick*):

> "Hearings on an application for a comprehensive permit are held subject to the provisions of G. L. c. 40A, § 11. See G. L. c. 40B, § 21. 'Parties in interest' entitled to notice of hearings under G. L. c. 40A, § 11, are presumed to be 'persons aggrieved.' See *Watros* v. *Greater Lynn Mental Health & Retardation Ass'n*, 421 Mass. 106, 110-111 (1995). See also *Marotta* v. *Board of Appeals of Revere*, 336 Mass. 199, 203-204 (1957). General Laws c. 40A, § 11, defines '[p]arties in interest' as including 'abutters, owners of land directly opposite on any public or private street or way, and abutters to the abutters within three hundred feet of the property line of the petitioner.' "

[5]The town of Ipswich (town) has not met its minimum affordable housing obligation under G. L. c. 40B, § 20. See *Boothroyd* v. *Zoning Bd. of Appeals of Amherst*, 449 Mass. 333, 334 n.3 (2007).

establishment.[6] Vehicular access to the proposed structures will be by an existing driveway located at 110 County Road, property also owned by the YMCA, and on which the Ipswich Family YMCA is situated.

The property located at 108 County Road is included within the "rural residential A" zoning district. The property at 112 County Road is located in the "highway business" zoning district. The parties did not provide a copy of the town's zoning bylaw in its entirety, but no one disputes the fact that "commercial components [or uses] are allowed in the underlying [h]ighway [b]usiness [d]istrict in the [bylaw]." The development of the structure proposed for 112 County Road will violate two dimensional requirements of Ipswich's zoning bylaw — the minimum front setback of fifty feet and the minimum side setback of twenty feet for commercial uses.[7] To the east and north of the property lies a "large wetland," comprising over fifty acres. The property directly abuts "extensive streamways and border[s] vegetated wetlands" and "is an important and extensive system of wetlands." The water source "nourishes the Ipswich River and Saltonstall Brook," and "functions as a floodwater storage area." As such, in its application for a comprehensive permit, the YMCA also sought waivers from the bylaw that limit "development and activity within a portion of the buffer zone [of the wetlands], so-called no-build and no-disturbance zones."

After a series of public hearings, and its own extensive review, the board, in October, 2004, voted to grant the YMCA a comprehensive permit. The grant was made subject to the imposition of forty-two conditions. The conditions included the following: a statement of permissible and impermissible commercial uses for the commercial space at 112 County Road[8]; a requirement that one hundred per cent of the dwelling units be

---

[6]While the affordable housing and child care component of the mixed-use building at 112 County Road would be owned and operated by the YMCA, the YMCA plans to sell the remaining commercial space as condominium units to an "unaffiliated party."

[7]The structure planned for 112 County Road has a front setback of only 5.1 feet, and a side setback of only 7.4 feet.

[8]The board prohibited the following uses in the commercial units: "eating and drinking places whether seating is provided or not, formula fast food

reserved for rental to households earning no more than sixty per cent of the median household income for the Boston primary metropolitan statistical area; a requirement that all of the units remain affordable in perpetuity or as long as the property is used for residential purposes and does not comply with local zoning requirements, whichever is longer; requirements addressing and monitoring traffic; and a requirement that both structures, and all units therein, connect to town water and sewer.

In addition, the board imposed a number of conditions concerning drainage and storm water management. The board required that the YMCA comply with the storm water management policy of the Department of Environmental Protection (department),[9] and in the event that such compliance is neglected, provided that "the [t]own may perform necessary maintenance or repairs and the [YMCA] shall convey any easement necessary to implement such guidelines [for the operation and maintenance of the storm water management system] [and] reimburse the [t]own for any and all expense associated therewith." The board also provided that the conservation commission's order of conditions, or any applicable order of the department concerning the property, "shall be made a part of [the] comprehensive permit."

Pursuant to G. L. c. 40B, § 21,[10] the plaintiffs filed separate complaints in the Superior Court challenging the board's decision to grant the comprehensive permit. The cases were con-

establishment, sale of alcoholic beverages, any form of live entertainment, massage parlor, tattoo parlor, so-called adult bookstore, so-called adult cinema, pinball arcade, video arcade, or other amusement and recreation or indoor entertainment, and pet store."

[9]The board could not waive compliance with State laws. See *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 355 (1973) (G. L. c. 40B confers on board power to override local "requirements and regulations," including town zoning ordinances or bylaws).

[10]General Laws c. 40B, § 21, provides, in pertinent part, that "[a]ny person aggrieved by the issuance of a comprehensive permit or approval may appeal to the court as provided in [G. L. c. 40A, § 17]." General Laws c. 40A, § 17, in turn, provides that "[a]ny person aggrieved by a decision of the board of appeals . . . may appeal to . . . the superior court department in which the land concerned is situated . . . by bringing an action within twenty days after the decision has been filed in the office of the city or town clerk. . . . The complaint shall allege that the decision exceeds the authority of the board or authority, and any facts pertinent to the issue, and shall contain a prayer that the decision be annulled. . . ."

solidated, and the parties filed cross motions for summary judgment. The YMCA moved for summary judgment on the ground that the plaintiffs lacked standing. The plaintiffs filed oppositions, and cross motions for summary judgment, seeking to invalidate the board's grant of the permit on the ground that the board lacks authority under G. L. c. 40B, §§ 20-23, to waive local dimensional zoning requirements regulating commercial uses on property being used for the development of affordable housing.

The judge initially noted that the parties submitted evidence of events that occurred after the board had granted the comprehensive permit. In particular, in December, 2004, the conservation commission issued an order of conditions for the project. Later, in July, 2005, after conducting its review of the project, the department issued a superseding order of conditions affirming the conservation commission's original order of conditions. The superseding order contained the following special condition, modifying the original order:

> "At the time of construction, it shall be the applicant's responsibility to evaluate whether any flooding caused by beaver dams[11] has altered the site conditions such that the function or performance of any of the proposed water management structures would be adversely affected. If so, the applicant shall propose modifications, limited to the location and/or elevation of those elements of the storm water system, to [the department] and the conservation commission for review. If the modifications are acceptable to [the department], they shall be approved for construction. No construction shall take place until such approval is received in writing."

The approval states that, in the department's opinion, "the project as proposed and conditioned herein adequately protects the interests of the [Wetlands Protection] Act and [r]egulations."

---

[11]According to the conservation commission (but not disputed by the parties), beaver activity creates "ponding and increase[s] wetlands." In particular, beaver activity can, among other impacts, increase "areal extent and water depth" in wetlands. When surfaces near beaver dams are filled, thereby increasing impervious surfaces, the filled surface's flood storage function is effectively eliminated and the result "would be expressed as increased flooding downstream."

The judge went on to address standing. The judge noted that the plaintiffs, as abutters, ordinarily are entitled to a presumption of standing. Relying on the Appeals Court's decision in *Standerwick* v. *Zoning Bd. of Appeals of Andover*, 64 Mass. App. Ct. 337 (2005), *S.C.*, 447 Mass. 20 (2006), the judge concluded that because the board had not presented evidence warranting a conclusion that Jepson's property would not be diminished in value as a result of the project, Jepson had at least one valid basis for standing. Because one plaintiff had standing to appeal, the judge declined to decide whether a municipal housing authority that is an abutting landowner may be a "person" for purposes of standing. See *Save the Bay, Inc.* v. *Department of Pub. Utils.*, 366 Mass. 667, 674-675 (1975).

The judge went on to reject the claim that the board lacked authority to override local zoning requirements as applied to a commercial component of an affordable housing development. The judge concluded that Jepson failed to provide sufficient evidence to raise a material question of fact as to the reasonableness and validity of the board's decision as it pertains to storm water management, drainage, and the effects of ongoing beaver activity on water levels and wetlands. The judge explained that Jepson's reliance on submissions to the department, in which the town's conservation agent and conservation commission dispute certain claims the YMCA's consultant made on the effect of ongoing beaver activity, did not create a disputed material question of fact because the board addressed the issue of beaver activity by expressly making any order or superseding order of conditions of the conservation commission or the department a special condition of the comprehensive permit. The judge further explained that Jepson's submissions were made to the department, which addressed the issue in a special condition which, due to the board's decision, is part of the comprehensive permit. The judge thus allowed the YMCA's motion for summary judgment and denied the plaintiffs' cross motions for summary judgment. Judgment entered affirming the grant of the comprehensive permit. The plaintiffs appealed.

1. *Standing.* Just before the judge's decision entered in this case, we granted an application for further appellate review of the Appeals Court's decision in *Standerwick* v. *Zoning Bd. of*

*Appeals of Andover*, 64 Mass. App. Ct. 337 (2005). See 445 Mass. 1105 (2005). We rejected the statement (relied on by the Appeals Court in its *Standerwick* decision) in *Bell* v. *Zoning Bd. of Appeals of Gloucester*, 429 Mass. 551, 553 (1999), that the "same standing requirements apply to appeals under G. L. c. 40A and G. L. c. 40B appeals." *Standerwick* v. *Zoning Bd. of Appeals of Andover*, 447 Mass. 20, 28 (2006) (*Standerwick*), quoting *Bell* v. *Zoning Bd. of Appeals of Gloucester, supra*. We stated: "Although the Legislature chose in G. L. c. 40B, § 21, to incorporate the judicial review procedure established in G. L. c. 40A, § 17, the substantive standing requirements of G. L. c. 40A are neither the same as nor incorporated into G. L. c. 40B." *Standerwick, supra* at 28. We concluded that "the diminution of real estate values is not an injury to an interest that G. L. c. 40B was intended to protect," and was not, therefore, an injury that could confer standing on the plaintiffs. *Id.* at 21.

In *Standerwick*, however, we explained that the term "person aggrieved," as used in both G. L. c. 40A and G. L. c. 40B, should be interpreted in a like manner. *Standerwick, supra* at 27. We went on to say, "[s]pecifically, a 'person aggrieved' as that term is used in both statutes must assert 'a plausible claim of a definite violation of a private right, a private property interest, or a private legal interest.' . . . Of particular importance, the right or interest asserted must be one that the statute under which a plaintiff claims aggrievement intends to protect." (Citations omitted.) *Id.* at 27-28. We also went on to note that the rebuttable presumption afforded to abutters — that they are "persons aggrieved" under G. L. c. 40A, see note 4, *supra* — "applies with equal force in the context of challenges to comprehensive permits issued pursuant to G. L. c. 40B." *Id.* at 33. "Once the presumption is rebutted,[12] the burden rests with the plaintiff to prove standing, which requires that the plaintiff

---

[12]To rebut the presumption, "the defendant must offer evidence 'warranting a finding contrary to the presumed fact.' " *Standerwick, supra* at 34, quoting *Marinelli* v. *Board of Appeals of Stoughton*, 440 Mass. 255, 258 (2003). "In a summary judgment context, a defendant is not required to present affirmative evidence that refutes a plaintiff's basis for standing," but can instead demonstrate that the party opposing the motion has no reasonable expectation of proving a legally cognizable injury. *Standerwick, supra* at 35.

'establish — by direct facts and not by speculative personal opinion — that his injury is special and different from the concerns of the rest of the community.' " *Id.*, quoting *Barvenik* v. *Aldermen of Newton*, 33 Mass. App. Ct. 129, 132 (1992). "Once a defendant 'challenges the plaintiff's standing and offers evidence to support the challenge . . . the jurisdictional issue is to be decided on the basis of the evidence with no benefit to the plaintiff from the presumption." *Standerwick, supra*, quoting *Barvenik, supra* at 131.

a. In light of our *Standerwick* decision, the judge's basis for conferring standing on Jepson, a diminution in value of his real estate, is erroneous. *Id.* at 21. We inquire, therefore, whether other valid bases for standing remain. The judge concluded that the board correctly demonstrated that "the remaining interests identified by Jepson are either not legally cognizable . . . or that [it] adduced sufficient evidence to make the presumption [afforded to abutters] recede and to require Jepson to adduce evidence establishing the existence of a material question of fact [which he] failed to do." The judge did not explain or point to anything in the record to support these conclusions. Because the case is here on a grant of summary judgment, we review the material evidence in a light most favorable to the nonmoving party, here, Jepson. See *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991). An examination of the record establishes that Jepson sufficiently demonstrated that he has standing to challenge the grant of the comprehensive permit based on flooding to his property because, under *Standerwick*, flooding constitutes an injury to an interest that G. L. c. 40B was intended to protect.

As explained by the conservation commission, in general terms, the project involved not only the construction of two new structures, but also the filling of surfaces on the YMCA's property that serve as a storm water detention function adjacent to a critical and sizeable wetlands area. That filling, combined with beaver activity on nearby streamways, raises issues of downstream flooding. Downstream "the streamflow is constrained by small culverts under the driveways to the Jepson property before it reaches the highway culvert [and, ultimately, the Ipswich River]."

While the prevention of flooding (and the retention of flood storage capacity) in land constituting, and immediately adjacent to, wetlands are interests protected and regulated by, in the first instance, the department and the Wetlands Protection Act, G. L. c. 40B permits the waiver only of *local* requirements, not State laws. Although the town may impose (and here did impose) even stricter wetlands protections that appropriately may be waived by the local board, it does not follow that the interests served by such protections are thereby excluded from the c. 40B scheme. The fact that under G. L. c. 40B, § 21, a board, on receipt of an application for a comprehensive permit, "shall forthwith notify each such local board [that would otherwise act with respect to the application], of the filing of such application by sending a copy thereof to such local boards for their recommendations," and "shall take into consideration the recommendations of the local boards," illustrates the Legislature's intent that the interests protected by local boards not only be recognized, but also be considered, during the comprehensive permit process. Thus, the interests of the conservation commission, and the department, in the prevention of flooding in, bordering, or affecting an integral and comprehensive wetlands system adjacent to an affordable housing development are interests that the G. L. c. 40B statutory scheme intends to protect.

The YMCA acknowledges that, as an abutter, Jepson is entitled to a rebuttable presumption that he is a "person aggrieved" under G. L. c. 40B, and therefore has standing to appeal from the grant of the comprehensive permit. *Standerwick, supra* at 33. To rebut the presumption, the YMCA submitted two affidavits of an engineer and senior project manager to the effect that the project would have no negative impact on flooding in the critical wetlands area. The YMCA contends that Jepson was required to rebut its evidence with expert evidence, and because he did not, he lacks a valid basis for standing. The YMCA also argues that, because the board imposed various conditions on the project calculated to alleviate the issue of flooding, Jepson lacks standing to challenge the board's decision.

The latter argument of the YMCA was rejected in *Marashlian* v. *Zoning Bd. of Appeals of Newburyport,* 421 Mass. 719, 723 (1996). With respect to the issues of parking and traffic in the

*Marashlian* case, the court explained, "[t]hat the judge ultimately found the reduced number of [parking] spaces provided by the variance to be adequate does not defeat a claim of injury to legal rights of the type intended to be protected by the zoning enabling act. Such a finding goes to the plaintiffs' success on the merits and *not to their ability to challenge acts of the board*" (emphasis supplied). *Id.* The same can be said for the issue of flooding in this case. That flooding can be controlled, or alleviated, has no bearing on standing as long as Jepson "put forth credible evidence to substantiate his allegations." *Id.* at 721. Indeed, "[a] review of standing based on 'all the evidence' does not require that the factfinder ultimately find a plaintiff's allegations meritorious. To do so would be to deny standing, after the fact, to any unsuccessful plaintiff." *Id.* Here, Jepson "put forth credible evidence to substantiate his allegations" of flooding to his property, including reliance on the expertise and findings of the conservation commission.[13] See *id.*

Jepson provided an affidavit in which he states that he is an abutter to the property. He explains that beaver dams constructed after July of 2004 have raised the baseline water level on his property so that "any moderate rainfall" results in the flooding of the property at 108 County Way and of his own property. He submitted photographs illustrating the flooding. As previously noted, there was evidence in the record concerning the storm water detention function of the property and the concern of downstream flooding from filling the property and from nearby beaver activity. In addition, Jepson submitted copies of documents from the conservation commission to the department. These documents, dated in May and June of 2005 (well after the grant of the comprehensive permit), discuss the existence, and effect, of nearby dams, and, in particular, one dam located on property owned by the town and by the YMCA, and another dam located on property owned by Jepson. The documents

---

[13]This latter evidence, from the conservation commission, took the "evidence" relied on by Jepson out of the realm of "apprehension and speculation." See *Standerwick*, *supra* at 36. While expert testimony may sometimes be required in a particular case, we have never held that it is always required. See, e.g., *Marashlian* v. *Zoning Bd. of Appeals of Newburyport*, 421 Mass. 719, 723 (1996). No one disputes that the conservation commission has expertise on issues related to the protection of wetlands.

point out the change in character of the dam located on property owned by the town and the YMCA. The documents also state that the effect of one of these dams has been to raise water elevation, which necessarily has an impact on the project's storm water detention function and affects flood control in the area, and that "a redesign of the drainage and proposed bank restoration is in order." Based on this evidence, Jepson presented sufficient proof on the issue of flooding to his property as a result of the project to warrant a conclusion that he is a "person aggrieved," entitled to appeal from the grant of the comprehensive permit.

b. Although it is only necessary to determine that one plaintiff has standing to challenge the board's action, see *Save the Bay, Inc.* v. *Department of Pub. Utils.*, 366 Mass. 667, 674-675 (1975), we turn next to the question whether a municipal housing authority that is an abutter to the project may be a "person" for purposes of standing under G. L. c. 40B, § 21. The housing authority is a municipal housing authority organized under the provisions of G. L. c. 121B. Municipal housing authorities are bodies politic and corporate, and are analogous to municipal corporations. G. L. c. 121B, § 1. See *Finance Comm'n of Boston* v. *McGrath*, 343 Mass. 754, 763 (1962). Municipal housing authorities are a creation of a municipality, and their operations are interwoven with the management and interests of the municipality in which they function. See *id.* at 764. They are also subject to substantial statutory regulation and public control. *Cameron* v. *Zoning Agent of Bellingham*, 357 Mass. 757, 761 (1970).

In *Planning Bd. of Hingham* v. *Hingham Campus, LLC*, 438 Mass. 364, 368 (2003), we concluded that a municipal planning board lacked standing under G. L. c. 40B, § 21, because "[m]unicipal boards and officers are not 'person[s]' for purposes of standing." See *Commonwealth* v. *Dowd*, 37 Mass. App. Ct. 164, 166 (1994), and cases cited (in term "person aggrieved," "the word 'person' ordinarily does not describe the State or its subdivisions"). These cases do not involve a situation where the municipal body actually owns land in a form similar to a municipal corporation's abutting the proposed development. Based on this status, the housing authority qualifies as a "person"

for standing purposes. This conclusion distinguishes a housing authority from a board or agency of a municipality (as was the situation in the *Hingham* case) and is consistent with the directive that the term "person aggrieved" should not be construed narrowly. See *Marotta* v. *Board of Appeals of Revere*, 336 Mass. 199, 204 (1957). See also *Standerwick, supra* at 27 (term "person aggrieved," as used in both G. L. c. 40A and G. L. c. 40B, should be interpreted in like manner). It is also consistent with those provisions of G. L. c. 40A, § 11, which define "[p]arties in interest" as "abutters," and the presumption afforded to such abutters that they are "persons aggrieved." *Standerwick, supra* at 33 & n.17. However, a municipal housing authority's status as a "person" for standing purposes does not establish its "aggrievement." The YMCA argues that the housing authority does not qualify as a "person aggrieved." We need not take up this issue because Jepson has standing to contest the board's action.

2. *Waiver of local zoning requirements to commercial component of affordable housing development.* We turn now to the central issue in this case, whether the board, when granting the comprehensive permit, could override dimensional requirements (pertaining to front and side setbacks) for a commercial use included within the affordable housing development. We conclude that when commercial use is permitted on the property to be developed under the local zoning bylaw or ordinance, the board, under G. L. c. 40B, §§ 20-23, has that authority.

The plaintiffs do not dispute that when, as is the case with the property at 112 County Road, an affordable housing development is proposed to be located in a commercial zone or zone that permits commercial use, the development may contain mixed residential and commercial uses. They maintain, however, that the commercial component of the development must conform to all local requirements and regulations concerning commercial use, and that the proposed commercial component in this case does not comply with certain dimensional requirements governing commercial use. Thus, the plaintiffs conclude that the YMCA needs to obtain a variance to waive those requirements, and cannot merely rely on the grant of a comprehensive permit to

accomplish that result.[14] The plaintiffs argue that the judge impermissibly expanded the scope of G. L. c. 40B, because the plain language and intent of the statute make clear that waivers of local requirements are intended only to benefit affordable housing, or residential use, and not commercial development and use.

Affordable housing developments do not solely benefit those who qualify for the housing. See *Middleborough* v. *Housing Appeals Comm.*, 449 Mass. 514, 517 n.7 (2007) ("To be eligible for a comprehensive permit under G. L. c. 40B, § 21, it is 'commonly understood' that in a residential development with both affordable and market-rate units, at least [or only] twenty-five per cent of the planned project must be set aside for owners or renters with incomes that do not exceed eighty per cent of the area median income"). Flexibility, such as that demonstrated by the minimum percentage of affordable housing units required under the statutory scheme, promotes the continued development of affordable housing by providing economic incentives (such as financial cross-subsidization derived from rental income of market-rate units) to developers so they can include in their projects needed affordable housing. Extending that flexibility to allow an *incidental* commercial component under the umbrella of the comprehensive permit provides additional incentives, including economic, to developers to establish affordable housing, and serves to further the development of needed affordable housing.

This conclusion is consistent with the statutory scheme and the Legislature's intent. See *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 354 (1973) (G. L. c. 40B "must be construed in a manner that effectuates its intent"). Nothing in G. L. c. 40B, §§ 20-23, expressly prohibits the inclusion of incidental commercial uses (when such uses are

[14]Jepson makes much of the fact that the judge erroneously noted in her opinion that, absent the grant of a comprehensive permit, the YMCA would have needed to obtain a special permit (as opposed to a variance) to bypass the dimensional requirements for the commercial component of the development. Although Jepson correctly points out the critical differences in the standards to be applied to award relief pursuant to a special permit, variance, and comprehensive permit, because of our conclusion, the judge's misstatement is of no consequence.

permitted on the proposed property by zoning ordinance or bylaw) to complement an affordable housing development. Further, the Legislature took into account that developers of affordable housing need to generate a reasonable economic return on their investment. This consideration is significant as illustrated by the right of appeal afforded to developers under G. L. c. 40B, § 22, when a developer's application for a comprehensive permit is denied "or is granted with such conditions and requirements as to make the building or operation of such housing uneconomic."[15] It has been "long recognized that the Legislature's intent in enacting G. L. c. 40B, §§ 20-23, is 'to provide relief from exclusionary zoning practices which prevented the construction of badly needed low and moderate income housing.' " *Standerwick, supra* at 28-29, quoting *Board of Appeals of Hanover* v. *Housing Appeals Comm., supra.* "The statute reflects the Legislature's considered judgment that a crisis in housing for low and moderate income people demands a legislative scheme that requires the local interests of a town to yield to the regional need for the construction of low and moderate income housing, particularly in suburban areas." *Standerwick, supra* at 29. Our conclusion represents yet another instance where a yield to the regional need for affordable housing is appropriate.[16]

Some final points are in order. Contrary to Jepson's suggestion, the judge applied the correct legal standard to review the merits of the plaintiffs' complaints. See *MacGibbon* v. *Board of*

---

[15]General Laws c. 40B, § 20, defines the term "[u]neconomic" as "any condition brought about by any single factor or combination of factors to the extent that it makes it impossible for a public agency or nonprofit organization to proceed in building or operating low or moderate income housing without financial loss, or for a limited dividend organization to proceed and still realize a reasonable return in building or operating such housing within the limitations set by the subsidizing agency of government on the size or character of the development or on the amount or nature of the subsidy or on the tenants, rentals and income permissible, and without substantially changing the rent levels and unit[] sizes proposed by the public, nonprofit or limited dividend organizations."

[16]We note that at least three other affordable housing developments, in different municipalities, have been approved under G. L. c. 40B and include commercial uses. These cases illustrate that some commercial uses, such as the provision of child care services, may benefit not only those who reside in affordable housing developments, but also the general community.

*Appeals of Duxbury*, 356 Mass. 635, 639 (1970) (decision of board "cannot be disturbed unless it is based on a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary"). The judge's statement that Jepson did not demonstrate that the development "is a subterfuge for commercial development" is not reasonably understood to mean that Jepson was obligated to prove subterfuge. If the proposed housing development were a pretext for commercial development, that would have been a reason to challenge the board's decision. The fact that the board did not explain how the commercial uses would enhance the development does not make its decision unreasonable, capricious, or arbitrary. Finally, in contesting the determination that the commercial use within the project comprises less than fourteen per cent of the development, Jepson fails to take into account the fact that the proposed structures are three stories in height.

3. *Disputed issues of material fact.* We reject Jepson's claim that the judge should have vacated the grant of the comprehensive permit on the ground that disputed issues of material fact remain pertaining to the effectiveness of the YMCA's storm water management system because of beaver activity that postdated the board's action on the application. The judge's decision reflects that she did not "ignore" Jepson's submissions. Jepson's submissions were reviewed by the department, which ultimately concluded that its superseding order of conditions would adequately protect the interests of the Wetlands Protection Act. Jepson has not shown that the judge's decision, essentially accepting the department's position on this point, was unreasonable, capricious, or arbitrary. See *MacGibbon* v. *Board of Appeals of Duxbury*, *supra* at 639.

*Judgment affirmed.*